**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JEFFREY BRIAN GIBERT,

*Defendant-Appellant.*

No. 10-4848

———————————————

THE HUMANE SOCIETY OF THE
UNITED STATES,

*Amicus Supporting Appellee.*

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

GERALD BENFIELD,

*Defendant-Appellant.*

No. 10-4851

———————————————

THE HUMANE SOCIETY OF THE
UNITED STATES,

*Amicus Supporting Appellee.*

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

        v.

JOHN CARLTON THURMAN HOOVER,

        *Defendant-Appellant.*

        No. 10-4852

THE HUMANE SOCIETY OF THE UNITED STATES,

        *Amicus Supporting Appellee.*

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

        v.

MICHAEL MONROE GROOMS,

        *Defendant-Appellant.*

        No. 10-4875

THE HUMANE SOCIETY OF THE UNITED STATES,

        *Amicus Supporting Appellee.*

UNITED STATES OF AMERICA,

           *Plaintiff-Appellee,*

           v.

GENE AUDRY JEFFCOAT,

           *Defendant-Appellant.*

THE HUMANE SOCIETY OF THE
UNITED STATES,

           *Amicus Supporting Appellee.*

No. 10-4904

Appeals from the United States District Court
for the District of South Carolina, at Columbia.
Cameron McGowan Currie, District Judge.
(3:09-cr-01174-CMC-4; 3:09-cr-01174-CMC-5;
3:09-cr-01174-CMC-7; 3:09-cr-01174-CMC-1;
3:09-cr-01295-CMC-1)

Argued: January 24, 2012

Decided: April 20, 2012

Before GREGORY and KEENAN, Circuit Judges, and
Liam O'GRADY, United States District Judge for the
Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Keenan wrote the opinion, in which Judge Gregory and Judge O'Grady joined.

## COUNSEL

**ARGUED:** Steven Michael Hisker, Duncan, South Carolina, for Appellants. Nathan S. Williams, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee. **ON BRIEF:** Lori S. Murray, LAW OFFICE OF LORI S. MURRAY, Columbia, South Carolina, for Appellant Gerald Benfield; T. Micah Leddy, THE LEDDY LAW FIRM, LLC, Columbia, South Carolina, for John Carlton Thurman Hoover; Joseph M. McCulloch, Jr., LAW OFFICE OF JOSEPH M. MCCULLOCH, JR., for Appellant Michael Monroe Grooms; Debra Y. Chapman, Columbia, South Carolina, for Appellant Gene Audry Jeffcoat. William N. Nettles, United States Attorney, Columbia, South Carolina, for Appellee. Jonathan R. Lovvorn, Kimberly D. Ockene, Aaron D. Green, THE HUMANE SOCIETY OF THE UNITED STATES, Washington, D.C.; Emily L. Aldrich, HUNTON & WILLIAMS LLP, Los Angeles, California; Gregory N. Stillman, HUNTON & WILLIAMS LLP, Norfolk, Virginia; Joseph P. Esposito, William E. Potts, Jr., Andrew E. Walsh, HUNTON & WILLIAMS LLP, Washington, D.C., for The Humane Society of the United States, Amicus Supporting Appellee.

## OPINION

BARBARA MILANO KEENAN, Circuit Judge:

The primary question in this appeal is whether Congress exceeded its power under the Commerce Clause in enacting a criminal prohibition against animal fighting. Jeffrey Brian Gibert and certain other defendants (collectively, Gibert) were indicted for their roles in organizing, operating, and participating in "gamefowl derbies," otherwise known as "cockfighting." Gibert entered a conditional guilty plea to the charge of conspiring to violate 7 U.S.C. § 2156 (the animal fighting

statute), which prohibits, among other things, "sponsor[ing] or exhibit[ing] an animal in an animal fighting venture." The term "animal fighting venture" is defined in the statute, in relevant part, as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(g)(1).

In his plea agreement, Gibert reserved the right to challenge the constitutionality of the animal fighting statute. He argued in the district court, and now argues to this Court, that Congress' power under the Commerce Clause does not extend to the enactment of legislation prohibiting animal fighting ventures. Gibert contends that animal fighting is inherently an intrastate activity that has no substantial affect on interstate commerce and, thus, is a matter reserved for regulation by the states, rather than by the federal government. He also advances an argument regarding the scienter requirement of the animal fighting statute, contending that the government was required to prove that he had knowledge that the animal fighting venture "was in or affected interstate commerce." Upon our review of the parties' arguments, we hold that the animal fighting statute is a legitimate exercise of Congress' power under the Commerce Clause. We also hold that the statute does not require the government to prove the defendants' knowledge regarding the particular venture's nexus to interstate commerce. Accordingly, we affirm Gibert's convictions.

I.

In November 2009, a federal grand jury returned an indictment against Gibert,[1] alleging one count of participating in a

---

[1]The indictment named as Gibert's co-defendants Gerald Benfield, John Carlton Thurman Hoover, and Michael Monroe Grooms, each of whom are co-parties to Gibert's appeal.

conspiracy to violate the Animal Welfare Act, in violation of 18 U.S.C. § 371, and one count of participating in, and/or aiding and abetting, an unlawful animal fighting venture, in violation of 7 U.S.C. § 2156(a)(1) and 18 U.S.C. § 2. The indictment alleged that Gibert and his co-defendants each entered one or more roosters in one or more "cockfighting derbies" held in Swansea, South Carolina in July 2008 and April 2009.

The indictment described a "cockfighting derby" as a series of fights between roosters, in which the owner of the rooster with the most victories in a series of fights wins a monetary "purse," which is comprised of the derby participants' entry

---

The grand jury returned a separate indictment in December 2009 against Gene Audry Jeffcoat, on whose property the cockfighting derbies took place, charging him with one count of organizing, supervising, and participating in a conspiracy to violate the Animal Welfare Act, in violation of 18 U.S.C. § 371, two counts of participating in, and/or aiding and abetting, an unlawful animal fighting venture, in violation of 7 U.S.C. § 2156(a)(1) and 18 U.S.C. § 2, and two counts of conducting and supervising an illegal gambling business, in violation of 18 U.S.C. § 1955 and 18 U.S.C. § 2. Jeffcoat is a named party to this appeal but, unlike the other appellants, Jeffcoat's guilty plea was not conditional, and the government asserts that he has waived the arguments presented by Gibert. However, the government has not asked that Jeffcoat's appeal be dismissed. James Morrow Collins, Jr. was also named as a defendant in Jeffcoat's indictment. Collins' case proceeded to trial, and he was convicted by a jury.

The Gibert indictment also named as defendants Michael T. Rodgers, Johnny Junior Harrison, Coy Dale Robinson, Jimmie Jesse Hicks, and George William Kelly, none of whom are parties to the present appeal, as well as Leslie Wayne Peeler and Scott Edward Lawson, who are each part of a separate class of defendants, including Collins, who proceeded to a jury trial and have appealed their convictions in a companion case, *United States v. Lawson*, No. 10-4831, ___ F.3d ___ (4th Cir. Apr. 20, 2012). Gibert's appeal and Lawson's appeal proceeded on separate briefing schedules, but this Court consolidated the two cases for purposes of oral argument. Because the two cases raise certain distinct legal issues, and were based on different proceedings in the district court, we are concurrently issuing separate opinions for the two cases.

fees minus the amount retained by the derby organizers. Before the fights, the roosters are equipped with a knife, gaff, or other sharp instrument that is affixed to the roosters' legs. As stated in the indictment, "[t]he fight is ended when one rooster is dead or refuses to continue to fight. If not killed during the fight, the losing rooster is typically killed after the fight." Spectators not otherwise involved in the fights pay an admission fee to attend the derbies, and gambling routinely occurs between the spectators and the owners of the roosters. Paraphernalia, such as gaffs, tie cords, cages, training equipment, medication, and veterinary supplies, some of which are manufactured in or transported from other states, are sold before or during the fights.

Gibert initially entered a plea of not guilty, and filed a motion to dismiss the indictment in which he asserted that the animal fighting statute is unconstitutional because, in enacting the statute, Congress exceeded its powers under the Commerce Clause. Gibert also filed a motion seeking a jury instruction that would require the government to prove that he had knowledge that the animal fighting venture was an event "in or affecting interstate or foreign commerce."

After the district court denied these motions, Gibert entered a conditional guilty plea to Count I of the indictment alleging a conspiracy to violate the animal fighting statute. In his written plea agreement, Gibert stipulated that the government could satisfy its burden of proving the elements of 7 U.S.C. § 2156, including that he: "(A) [ ] knowingly sponsored or exhibited; (B) [a]n animal; (C) [i]n an event that was in or affecting interstate commerce and that involved a fight between at least two animals for the purpose of sport, wagering or entertainment; and (D) [w]hich event also violated State Law."[2] Pursuant to the plea agreement and its Rule 11 Addendum, Gibert reserved the right to challenge on appeal

---

[2]Cockfighting is illegal in South Carolina, and has been since 1887. *See* S.C. Code § 16-17-650.

Congress' powers under the Commerce Clause to enact the animal fighting statute, as well as the district court's ruling that the government need not establish as an element of the offense Gibert's knowledge that the cockfighting derbies affected interstate commerce.[3]

The district court accepted Gibert's plea and sentenced him to a three-year term of probation and a monetary fine.[4] Gibert appeals his conviction, raising on appeal the legal issues he identified in his Rule 11 Addendum.[5]

## II.

## A.

We first address Gibert's argument that Congress exceeded its powers under the Commerce Clause in enacting the animal fighting statute. We review de novo a challenge to the constitutionality of a federal statute. *United States v. Buculei*, 262 F.3d 322, 327 (4th Cir. 2001). Although we conduct our review of the statute de novo, we view the statute with a "presumption of constitutionality in mind," because "[d]ue respect for the decisions of a coordinate branch of Government

---

[3]Gibert also stipulated to the facts necessary to establish a conspiracy conviction under 18 U.S.C. § 371, namely that "(A) [t]here was an agreement between two or more persons to violate the federal criminal law; (B) [Gibert] knew of the conspiracy; (C) [Gibert] knowingly and voluntarily became a part of the conspiracy; and (D) [a]t least one 'overt act' was taken in furtherance of the conspiracy within the District of South Carolina."

[4]The district court also accepted the pleas of Gibert's co-defendants Benfield, Hoover, and Grooms, sentencing them each to probation terms of three years and a monetary fine, as well as the plea of Jeffcoat, who was sentenced to five years' probation and a monetary fine.

[5]Gibert raised an additional legal issue in his Rule 11 Addendum, namely that the government was required to prove as an element of the offense that the derbies *substantially* affected interstate commerce. Gibert has not raised that issue on appeal.

demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000).

## B.

### i.

Because congressional findings of fact are an important consideration in determining whether a federal statute may survive a challenge under the Commerce Clause, *see id.* at 611-14, we begin our analysis by discussing the legislative history of the animal fighting statute. Congress' prohibition of animal fighting is a relatively recent addition to the Animal Welfare Act of 1966 (the AWA), which is contained in Title 7, Chapter 54 of the United States Code. The AWA initially was enacted to "prevent theft and sale for use in research of pet cats and dogs, and also to foster humane treatment by dealers and research facilities of cats, dogs, and certain other laboratory animals." H.R. Rep. No. 94-801 (1976), *reprinted in* 1976 U.S.C.C.A.N. 758, 759 (discussing legislative history of the AWA). The scope of the AWA was extended in 1970 to cover "most live or dead warm-blooded animals," and to include activities such as exhibitions and auction sales. *Id.*

In its current form, the AWA is a comprehensive regulatory scheme which covers, among other things, the licensing of certain animal dealers and exhibitors (7 U.S.C. § 2133), the marking and identification of, and recordkeeping concerning, animals sold in commerce (7 U.S.C. §§ 2141, 2142), requirements concerning the importation of live dogs (7 U.S.C. § 2148), the standards and certification process for humane handling, care, treatment, and transportation of animals (7 U.S.C. § 2133), regulations concerning the acquisition, storage, and treatment of animals in research facilities (7 U.S.C. §§ 2137, 2140, 2143), and the purchasing of, and standards of

care for, animals used in United States Government facilities (7 U.S.C. §§ 2138, 2144).

The congressional statement of policy in the AWA states that "[t]he Congress finds that animals and activities which are regulated under this chapter are either in interstate or foreign commerce or substantially affect such commerce or the free flow thereof, and that regulation of animals and activities as provided in this chapter is necessary to prevent and eliminate burdens upon such commerce and to effectively regulate such commerce . . . ." 7 U.S.C. § 2131. The statement of policy also provides that "[t]he Congress further finds that it is essential to regulate, as provided in this chapter, the transportation, purchase, sale, housing, care, handling, and treatment of animals by carriers or by persons or organizations engaged in using them for research or experimental purposes or for exhibition purposes or holding them for sale as pets or for any such purpose or use." *Id.*

The animal fighting statute was not included in the AWA until the passage of the Animal Welfare Act Amendments of 1976 (the Amendments). *See* H.R. Rep. No. 94-801, 1976 U.S.C.C.A.N. at 759, 762. Among other items, the Amendments expanded the existing prohibitions contained in the original AWA, expanded the Secretary of Agriculture's authority to establish and enforce standards relating to the AWA, and "add[ed] to the statute an entirely new section which would make it a crime punishable by fine and imprisonment knowingly to sponsor, participate in, transport, or use the mails to promote fights between live birds, live dogs or other mammals, except man." *Id.*, 1976 U.S.C.C.A.N. at 759.

In enacting the animal fighting statute, Congress initially focused its concern on dogfighting.[6] In the House Report dis-

---

[6]As noted in the House Report, "[a]s introduced, the bill would have prohibited fighting only between live dogs or other mammals. However, the Committee amended the bill to include cockfighting within the proscription." H.R. Rep. 94-801, 1976 U.S.C.C.A.N. at 762.

cussing the Amendments, the House Committee on Agriculture (the Committee) observed the rise of dogfighting and its connection to interstate commerce:

> [Dogfighting], a minor problem prior to World War II, has unfortunately grown and prospered to the point that Regional Conventions are held which attract fighting dogs and 'dog fanciers' from numerous states. They frequently are advertised in [dogfighting] magazines of nationwide circulation. In addition [to] the 'sporting element' of these enterprises, there apparently has grown up also a sort of traveling circus in which vans will travel from state to state and set up for brief periods offering patrons the opportunity to witness and gamble upon a series of dog fights and to indulge at the same time many questionable and criminal activities.

*Id.*, 1976 U.S.C.C.A.N. at 761. Accordingly, the Committee made factual findings that "animals and activities which are regulated under this Act are either in interstate or foreign commerce or substantially affect such commerce or the free and unburdened flow thereof, and that regulation of animals and activities as provided in this Act is necessary to prevent and eliminate burden[s] upon such commerce, to effectively regulate such commerce, to protect the human values of this great Nation from the subversion of dehumanizing activities, and to carry out the objectives of the Act." *Id.*, 1976 U.S.C.C.A.N. at 762.

The animal fighting statute has been amended and expanded since its passage in 1976 to reflect the increasing national consensus against this activity. In strengthening the animal fighting prohibition, members of Congress have emphasized the nexus between animal fighting and interstate commerce.[7] For instance, in connection with the 2007 amend-

---

[7]In addition to congressional committee reports, this Circuit has considered the statements of individual Members of Congress in analyzing

ments to the animal fighting statute that made a violation of the statute a felony, Senator Maria Cantwell of the State of Washington recognized the connection between animal fighting and the spread of costly and dangerous diseases such as the "bird flu," stating:

> It's time to get this felony animal fighting language enacted. With the bird flu threat looming, we can't afford to wait any longer. The economic consequences are staggering—the World Bank projects worldwide losses of $1.5 to $2 trillion. . . .
>
> Interstate and international transport of birds for cockfighting is known to have contributed to the spread of avian influenza in Asia and poses a threat to poultry and public health in the United States. According to the World Health Organization and local news reports, at least nine confirmed human fatalities from avian influenza in Thailand and Vietnam may have been contracted through cockfighting activity since the beginning of 2004. . . .
>
> Because human handling of fighting roosters is a regular occurrence, the opportunity of disease transmission from fighting birds to people is substantial. Fighting-bird handlers come into frequent, sustained contact with their birds during training and during organized fights. . . .

---

whether an activity regulated by federal statute substantially affects interstate commerce. *See, e.g.*, *United States v. Gould*, 568 F.3d 459, 473-74 (4th Cir. 2009) (citing statements from more than a dozen legislators in rejecting a Commerce Clause challenge to the Sex Offender Registration and Notification Act, 42 U.S.C. § 16901 *et seq.* and 18 U.S.C. § 2250); *Gibbs v. Babbitt*, 214 F.3d 483, 494 n.3 (4th Cir. 2000) (rejecting Commerce Clause challenge to federal regulation limiting the taking of red wolves on private land and noting that "[c]ommittee reports and legislative debates have emphasized the importance of endangered species to interstate commerce").

Cockfighters frequently move birds across State and foreign borders, bringing them to fight in different locations and risking the spread of infectious diseases. . . .

The USDA has stated that cockfighting was implicated in an outbreak of [exotic Newcastle disease] that spread through California and the Southwest in 2002 and 2003. That outbreak cost U.S. taxpayers nearly $200 million to eradicate and cost the U.S. poultry industry many millions more in lost export markets. The costs of an avian influenza outbreak in this country could be much higher—with the Congressional Budget Office estimating losses between 1.5 and 5 percent of GDP ($185 billion to $618 billion). . . .

153 Cong. Rec. S451-52 (daily ed. Jan. 11, 2007) (Statement of Sen. Cantwell).

Similarly, Representative Elton Gallegly of California spoke in support of strengthening the animal fighting statute in 2007, observing the significant economic impact that cockfighting causes in terms of the spread of disease:

There is the additional concern that cockfighters spread diseases that jeopardize poultry flocks and even public health. We in California experienced this first-hand, when cockfighters spread exotic Newcastle disease, which was so devastating to many of our poultry producers in 2002 and 2003. That outbreak cost U.S. taxpayers "nearly $200 million to eradicate, and cost the U.S. poultry industry many millions more in lost export markets," according to former Agriculture Secretary Ann Veneman.

153 Cong. Rec. E2 (daily ed. Jan. 5, 2007) (Statement of Rep. Gallegly).

Senator John Kerry of Massachusetts also sought to strengthen the animal fighting statute, concentrating on the growing commercial aspects of dogfighting:

> Dogfighting is an interconnected, nationwide, lucrative commercial industry. In addition to high-stakes gambling, dogfighters exchange tens if not hundreds of millions of dollars annually on the purchase and sale of fighting dogs. . . .
>
> This extensive commercial venture also requires trafficking in the specialized equipment necessary to train and house fighting dogs. . . .
>
> It could not be clearer that the overwhelming majority of dog fights-if not every single dog fight-are truly economic endeavors that involve some element of interstate commerce, such as animals, equipment, breeders, or spectators having traveled across State lines. Many dog fights are conducted for the purposes of illegal gambling, and some gambling on the sidelines is almost always present at these fights. Dogfighting also burdens interstate commerce by increasing the risk of injury or disease to both animals and humans . . . .
>
> What's more, small, localized dogfighting ventures, when viewed in the aggregate, have a substantial impact upon interstate commerce. . . . All of the activities associated with dogfighting, including gambling and other illegal activities, equipment outlays, breeding expenses, and promotion costs are not only inherently commercial in nature but transcend State boundaries.

153 Cong. Rec. S10409 (daily ed. July 31, 2007) (Statement of Sen. Kerry).

### ii.

The current version of the animal fighting statute, under which Gibert was indicted and convicted, was amended in 2008. In its present form, the animal fighting statute provides in relevant part that "it shall be unlawful for any person to knowingly sponsor or exhibit an animal in an animal fighting venture."[8] 7 U.S.C. § 2156(a)(1). The statute sets forth the following definition of an "animal fighting venture":

> [T]he term 'animal fighting venture' means any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment . . . .[9]

---

[8]The statute contains a "[s]pecial rule for certain State[s]," providing that "[w]ith respect to fighting ventures involving live birds in a State where it would not be in violation of the law, it shall be unlawful under this subsection for a person to sponsor or exhibit a bird in the fighting venture only if the person knew that any bird in the fighting venture was knowingly bought, sold, delivered, transported, or received in interstate or foreign commerce for the purpose of participation in the fighting venture." 7 U.S.C. § 2156(a)(2). The term "State" in the statute includes not only the 50 states of the United States but also the District of Columbia, the Commonwealth of Puerto Rico, and "any territory or possession of the United States." 7 U.S.C. § 2156(g)(3). Although cockfighting is illegal in all 50 States and the District of Columbia, cockfighting remains legal in several United States territories such as Guam and Puerto Rico. *See* Humane Society, *Cockfighting: State Laws Fact Sheet*, *available at* http://www.humanesociety.org/assets/pdfs/cockfighting_chart_2011.pdf (updated June 2010).

[9]The definition of "animal fighting venture" explicitly excludes the use of animals for hunting activities. *See* 7 U.S.C. § 2156(g)(1) ("the term 'animal fighting venture' shall not be deemed to include any activity the primary purpose of which involves the use of one or more animals in hunting another animal"). Additionally, we observe that the definition of "animal" pertains only to mammals and birds. *See* 7 U.S.C. § 2156(g)(4) ("the term 'animal' means any live bird, or any live mammal, except man").

7 U.S.C. § 2156(g)(1). Thus, as this definition plainly illustrates, a conviction for violating the animal fighting statute requires (a) that the activity be in or affect interstate or foreign commerce, and (b) be for purposes of sport, wagering, or entertainment.

C.

We next discuss the Commerce Clause, and the Supreme Court's construction of Congress' powers under that constitutional provision. The Commerce Clause delegates to Congress the power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3. The Supreme Court's "interpretation of the Commerce Clause has changed as our Nation has developed," and Congress currently enjoys "greater latitude in regulating conduct and transactions under the Commerce Clause than" previous Supreme Court cases had permitted. *Morrison*, 529 U.S. at 607-08 (citing *United States v. Lopez*, 514 U.S. 549, 552-57 (1995)).

Under the Court's "modern era" of Commerce Clause jurisprudence, as described in *Lopez* and *Morrison*, Congress may broadly regulate three categories of activity under its Commerce Clause powers: (1) "the use of the channels of interstate commerce," (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities," and (3) "those activities having a substantial relation to interstate commerce." *Morrison*, 529 U.S. at 609 (citing *Lopez*, 514 U.S. at 558-59). Under the Court's precedents, if a "rational basis exist[s] for concluding that a regulated activity sufficiently affect[s] interstate commerce," then a challenge to Congress' power under the Commerce Clause to regulate that activity must fail. *Lopez*, 514 U.S. at 557.

Despite the broad nature of Congress' power under the Commerce Clause, the Supreme Court has emphasized that

such power is "subject to outer limits," and that the Clause and the Court's decisions construing the Clause do not obliterate the distinction between "what is truly national and what is truly local." *Id.* at 557, 567-68. These concerns led the Court to hold in *Lopez* that Congress exceeded its power under the Commerce Clause in enacting the Gun-Free School Zones Act of 1990, which prohibited the possession of a firearm in a school zone. *Id.* at 551. In holding that Congress lacked power to enact that regulation, the Court concluded that the statute "neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce." *Id.* The Court further stated that the statute at issue "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce". *Id.* at 561.

The decision in *Lopez* also noted the absence of congressional findings of fact demonstrating a nexus between interstate commerce and gun possession in a school zone. *Id.* at 562. Although the Court acknowledged that such congressional findings normally are not required in order for Congress to legislate, the Court stated that "to the extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here." *Id.* at 563.

The Court in *Lopez* rejected as too attenuated the government's contention that possession of a gun in a school zone does in fact substantially affect interstate commerce. The Court explained that "[t]o uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at 567. Finally, the Court observed that prohibiting gun possession in a school zone "is

not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* at 561.

After *Lopez*, the Court rendered its decision in *Morrison*, holding that Congress exceeded its power under the Commerce Clause in enacting a provision in the Violence Against Women Act that afforded a civil remedy for victims of gender-motivated violence. 529 U.S. at 601-02. In holding that gender-motivated crimes of violence do not substantially affect interstate commerce, the Court relied heavily on its conclusion that such crimes "are not, in any sense of the phrase, economic activity." *Id.* at 613. The Court also observed that, like the statute invalidated in *Lopez*, the statute at issue in *Morrison* "contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce." *Id.*

Additionally, the Court noted in *Morrison* that although Congress had stated factual findings "regarding the serious impact that gender-motivated violence has on victims and their families," those findings were inadequate because they relied heavily on reasoning that the Court already had rejected as "unworkable." *Id.* at 614-15. The Court explained that the link urged by the government between gender-motivated violence and interstate commerce was attenuated, and that if that method of reasoning were accepted, it would allow the federal government to regulate any type of violent crime without limitation. *Id.* at 615. Repeating its pronouncement in *Lopez*, the Court observed that "[s]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Morrison*, 529 U.S. at 614 (quoting *Lopez*, 514 U.S. at 557 n.2). Accordingly, the Court held that Congress' prohibition of gender-motivated violence was "not directed at the instrumentalities, channels, or goods involved in interstate commerce," and hence was a subject area left for regulation by the states, rather than by the federal government. *Id.* at 617-18.

### D.

Within this context of the Supreme Court's Commerce Clause jurisprudence and the legislative history of the animal fighting statute, we consider Gibert's argument that Congress lacked the power to enact a ban on animal fighting. Based on our review, we have no difficulty concluding that Congress acted within the limitations established by the Commerce Clause in enacting the animal fighting statute.

The animal fighting statute, like the statutes reviewed in *Lopez* and *Morrison*, implicates the third category of Congress' Commerce Clause powers. Thus, the animal fighting statute is valid under the Commerce Clause only if the activity regulated, namely, animal fighting, has "a substantial relation to interstate commerce." *Morrison*, 529 U.S. at 609 (citing *Lopez*, 514 U.S. at 558-59). We conclude that, unlike the statutes invalidated in *Lopez* and *Morrison*, the activity of animal fighting and Congress' statutory prohibition of that activity bear the required nexus to interstate commerce that the Supreme Court found lacking in those other two cases.

We previously have observed that the decisions in *Lopez* and *Morrison* stated four factors that courts must consider in analyzing whether there is a rational basis for concluding that an activity substantially affects interstate commerce. *See Buculei*, 262 F.3d at 328 (rejecting Commerce Clause challenge to 18 U.S.C. § 2251, which prohibits the sexual exploitation of children with the intent to produce or transmit a video depiction of such exploitation). These four factors include:

> (1) whether the statute relates to an activity that has something to do with "'commerce' or any sort of economic enterprise, however broadly one might define those terms";
>
> (2) whether the statute contains an "express jurisdictional element which might limit its reach" to activi-

ties having "an explicit connection with or effect on interstate commerce";

(3) whether congressional findings in the statute or its legislative history support the judgment that the activity in question has a "substantial effect on interstate commerce"; and

(4) whether the link between the activity and a substantial effect on interstate commerce is attenuated.

*Buculei*, 262 F.3d at 328 (citing *Morrison*, 529 U.S. at 610-13). We address each of these factors in turn.

With regard to the first factor, we conclude that the animal fighting statute relates to "'commerce' or [some] sort of economic enterprise." *Cf. Morrison*, 529 U.S. at 610, 613; *Lopez*, 514 U.S. at 561. The very definition of "animal fighting venture" in the statute suggests economic activity, because the animal fighting that is prohibited must be for "purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(g)(1). There can be no serious dispute that the terms "sport," "wagering," and "entertainment" each are closely aligned in our culture with economics and elements of commerce. Indeed, the uncontested factual allegations of the present case also demonstrate the economic activities inherently involved in cockfighting: individuals paid a fee to enter their birds into the derby, the owner of the winning bird won the "pot" of the collective money paid by the entrants, minus any money retained by the derby organizers, and spectators and bird owners paid an admission fee to enter the building in which the birds fought.[10]

---

[10] This Court earlier observed in another case involving a conspiracy to violate the animal fighting statute that, for the cockfighting event at issue, animal owners paid between $75 and $400 to enter their animals in the fights, while spectators paid a $15 admission fee and routinely wagered on the bouts. *See United States v. Kingrea*, 573 F.3d 186, 189 (4th Cir. 2009).

We also observe that Gibert's argument would require us to reject or ignore congressional committee findings dating back to the original enactment of the animal fighting statute that such activities (a) attract fighting animals and spectators from numerous states, (b) are or have been advertised in print media of nationwide circulation, and (c) often involve gambling and other "questionable and criminal activities." H.R. Rep. No. 94-801, 1976 U.S.C.C.A.N. at 761. Further, we recognize and afford deference to Congress' findings in the AWA's "statement of policy" that the "animals and activities which are regulated under this chapter are either in interstate or foreign commerce or substantially affect such commerce or the free flow thereof."[11] 7 U.S.C. § 2131.

Additionally, we observe that the economic aspects of cockfighting are evident from statements to Congress made by a representative of the United Gamefowl Breeders Association (UGBA), an organization that advocated against certain recent amendments to the animal fighting statute. Jerry Leber, the President of the UGBA, testified before Congress in 2007 that the gamefowl industry, for which the principal or majority purpose is to produce fighting animals, generated "billions of dollars" in annual revenue before Congress' amendment that year to the statutory prohibition on animal fighting. *See Native American Methamphetamine Enforcement and Treatment Act of 2007, the Animal Fighting Prohibition Enforcement Act of 2007, and the Preventing Harassment through Outbound Number Enforcement (PHONE) Act of 2007: Hearing on H.R. 545, H.R. 137, and H.R. 740 Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 110th Cong. 57 (2007).

In his statement to Congress, Leber also represented that

---

[11]Also, Gibert has not provided any reason to discount the statements of Senators Kerry and Cantwell, and Representative Gallegly, as set forth above, concerning the substantial effect that animal fighting continues to have on interstate commerce.

"the total value of the gamefowl industry to the economy of the United States is a staggering total of $2 billion to $6 billion annually." *Id.* at 60. Further, when asked by Representative Hank Johnson of Georgia whether the "principal purpose" of the gamefowl breeding industry is "to produce fighting cocks," Mr. Leber replied: "That may be the majority use." *Id.* at 95.

In view of the above congressional findings, statements of individual members of Congress, and other information presented to Congress, we conclude that animal fighting, at least within Congress' definition of the term "animal fighting venture" in 7 U.S.C § 2156(g)(1), involves a "quintessentially economic" activity. *See Gonzales v. Raich*, 545 U.S. 1, 25 (2005) (holding that, unlike the activities at issue in *Lopez* and *Morrison*, the activities regulated by the Controlled Substances Act are "quintessentially economic"). And, in contrast to the statute invalidated in *Lopez*, the effect of animal fighting on interstate commerce is "visible to the naked eye." *Cf.* 514 U.S. at 563.

We next consider the second factor identified in *Lopez* and *Morrison*, whether the statute at issue contains an express element limiting the statute's reach to activities having an explicit connection with or effect on interstate commerce. *See Morrison*, 529 U.S. at 611-13. We conclude that the statute before us does contain such an element.

The statutory definition of an "animal fighting venture" provides, in relevant part, that the animal fighting event must be one "in or affecting interstate or foreign commerce." 7 U.S.C. § 2156(g)(1). Thus, to convict a defendant of violating the animal fighting statute, the government must allege and prove that the individual participated in an animal fighting event that had a connection with or effect on interstate or foreign commerce. *Cf. Lopez*, 514 U.S. at 561 (statute lacked element requiring that firearm possession in school zone affects interstate commerce); *Morrison*, 529 U.S. at 613 (stat-

ute did not contain element establishing that federal cause of action for violence against women is exercise of Congress' power to regulate interstate commerce). This express requirement in the animal fighting statute of a connection to, or effect on, interstate commerce thus satisfies the Supreme Court's concern, as expressed in *Lopez* and *Morrison*, that the statute at issue have a nexus to interstate commerce as an element of the offense. *See Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 613.

With regard to the third factor identified in *Lopez* and *Morrison*, we conclude that there are ample congressional findings in the statute and its legislative history that support the judgment that animal fighting has a substantial effect on interstate commerce. As we have noted, the AWA's statement of policy declares that the animals regulated under the Act "are either in interstate or foreign commerce or substantially affect such commerce or the free flow thereof." 7 U.S.C. § 2131. Additionally, the House Committee Report pertaining to the original enactment of the animal fighting prohibition in 1976 discussed the growing rise of commercial animal fighting and its strong connection to interstate commerce.[12] H.R. Rep. No. 94-801, 1976 U.S.C.C.A.N. at 759-61 (discussing dogfighting).

With regard to the fourth and final factor set forth in *Lopez* and *Morrison*, for the reasons discussed above, the link

---

[12]Further, as noted earlier, Senator Cantwell and Representative Gallegly successfully advocated strengthening the animal fighting prohibition by observing the connection between animal fighting and the "bird flu," and the economic consequences that would accompany a bird flu pandemic. *See* 153 Cong. Rec. S451-52 (daily ed. Jan. 11, 2007) (Statement of Sen. Cantwell); 153 Cong. Rec. E2 (daily ed. Jan. 5, 2007) (Statement of Rep. Gallegly); *see also* 153 Cong. Rec. S10409 (daily ed. July 31, 2007) (Statement of Sen. Kerry) (discussing interstate commercial aspects of dogfighting and observing that "[d]ogfighting is an inherently commercial and economic activity that has a substantial effect upon interstate commerce").

between animal fighting ventures and its effect on interstate commerce is not attenuated. Rather, the link is direct, because animal fighting ventures are inherently commercial enterprises that often involve substantial interstate activity. Thus, in contrast to the statute at issue in *Lopez*, there is no need to "pile inference upon inference" in order to establish the link between animal fighting and interstate commerce. *Cf.* 514 U.S. at 567.

In sum, our task is simply to determine, with a presumption of constitutionality in mind, whether there is a rational basis for concluding that the practice of animal fighting, when conducted for "purposes of sport, wagering or entertainment," substantially affects interstate commerce. In light of our consideration of the four factors employed by the Supreme Court in *Lopez* and *Morrison*, we hold that the district court did not err in concluding that the animal fighting statute was a legitimate exercise of Congress' power under the Commerce Clause.

We note that we have considered Gibert's arguments as presenting solely a facial challenge to the constitutionality of the animal fighting statute. We accord this construction to Gibert's arguments in view of the manner in which Gibert presented the Commerce Clause challenge in the briefs filed with this Court. However, to the extent that Gibert's brief suggests an as-applied challenge to the statute, such a challenge likewise fails. As we held in *United States v. Williams*, 342 F.3d 350 (4th Cir. 2003), the relevant question for purposes of a Commerce Clause analysis is not whether one particular offense has an impact on interstate commerce, but whether the class of acts proscribed has such an impact. *Id.* at 355; *see also United States v. Gould*, 568 F.3d 459, 475 (4th Cir. 2009) (citing *Williams* for same proposition).

As the Supreme Court explained in *Raich*, Congress has the "power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on

interstate commerce. . . . [W]hen a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence." 545 U.S. at 17 (citation and quotation marks omitted); *see also United States v. Forrest*, 429 F.3d 73, 79 (4th Cir. 2005) (applying *Raich* and holding that the defendant's "constitutional challenge, which rests entirely on the asserted de minimis economic effect of his own activities, must fail") (internal citation omitted).

Finally, we observe that if the cockfighting activities in which Gibert participated were wholly an intrastate activity, the government would be unable to establish one of the elements of the offense, namely, that the event be "in or affecting interstate or foreign commerce." 7 U.S.C. § 2156(g)(1). However, by his guilty plea to the offense, Gibert acknowledged that the government could prove that the event "was in or affecting interstate commerce."[13] *See United States v. Willis*, 992 F.2d 489, 490 (4th Cir. 1993) (holding that a voluntary and intelligent plea of guilty "is an admission of all the elements of a formal criminal charge") (quoting *McCarthy v. United States*, 394 U.S. 459, 466 (1969)). Therefore, any as-applied constitutional challenge to the animal fighting statute based on the manner in which the cockfighting operation was conducted necessarily fails.

## III.

We next consider Gibert's argument that the district court erred in its construction of the scienter element of the animal fighting statute. As stated above, the animal fighting statute provides, in relevant part, that "it shall be unlawful for any person to knowingly sponsor or exhibit an animal in an animal fighting venture." 7 U.S.C. § 2156(a)(i). An "animal

---

[13]We observe that Gibert explicitly indicated in the plea agreement that the government was required to prove as an element of the offense that the animal fighting venture was "in or affecting interstate commerce."

fighting venture" is defined as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment . . . ." 7 U.S.C. § 2156(g)(1).

Before agreeing to plead guilty, Gibert filed a motion in the district court seeking a jury instruction that would require the government to prove that he had knowledge that the animal fighting venture "was in or affected interstate commerce." The district court denied Gibert's motion, and issued an order stating that the court would instruct the jury that the government was not required to establish that Gibert knew that the animal fighting venture "was engaged in or was affecting" interstate commerce. After the district court issued this ruling, Gibert entered his conditional guilty plea, reserving the right to challenge that ruling on appeal.

The issue whether the district court correctly construed the scienter requirement of the animal fighting statute presents an issue of law, which we review de novo. *See United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996). In support of his scienter argument, Gibert relies almost exclusively on our decision in *United States v. Talebnejad*, 460 F.3d 563 (4th Cir. 2006), a case involving a charge of "knowingly" conducting an "unlicensed money tramsmitting business," in violation of 18 U.S.C. § 1960.[14]

In *Talebnejad*, we identified as an element of the crime the requirement that the prohibited business be one affecting interstate commerce. 460 F.3d at 568. Contrary to Gibert's

[14]That statute defines the term "unlicensed money transmitting business," in relevant part, as "a money transmitting business which affects interstate or foreign commerce in any manner or degree [and] is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable." 18 U.S.C. § 1960(b).

argument, however, we did not hold in that case that the government was required to prove that the defendant knew that the unlicensed business affected interstate commerce. Instead, our holding addressed whether the statute was constitutional in the absence of a mens rea requirement regarding the two elements of the statute dealing with state law licensing requirements.[15] *See id.* at 568. We answered that question in the affirmative, holding that the Due Process Clause did not require Congress to include a mens rea requirement regarding those "legal," as opposed to "factual," elements of the crime. *Id.* at 570. Thus, our holding in *Talebnejad* is inapposite to the scienter argument that Gibert advances here.[16]

We find no merit in Gibert's scienter argument, because Gibert's conviction for violating the animal fighting statute required proof of knowledge of the stated factual elements of the offense, but did not require proof of knowledge that the activity was "in or affected interstate commerce."[17] *See, e.g.,*

---

[15]We made the breadth of our holding in *Talebnejad* clear when we recited the five elements of the offense as "(1) operat[ing] a money transmitting business, (2) that affects interstate commerce, and (3) that is unlicensed under state law, when (4) state law requires a license and (5) state law punishes lack of a license as a felony or misdemeanor," and then stated that the question at issue is "whether the statute is constitutional in the absence of a mens rea requirement as to these [last] two elements." 460 F.3d at 568.

[16]Our reference in *Talebnejad* to the parties' agreement that there was a knowledge requirement regarding the interstate commerce element of the crime was not a holding of this Court, but merely a reference to the parties' position in the case.

[17]Congress, of course, is free to require knowledge of an interstate nexus as an element of the offense if Congress so chooses. As discussed in the *Lawson* companion case, the animal fighting statute does in fact require such actual knowledge if the defendant is prosecuted in a jurisdiction where animal fighting remains legal. *See* 7 U.S.C. § 2156(a)(2) ("Special rule for certain State[s]: With respect to fighting ventures involving live birds in a State where it would not be in violation of the law, it shall be unlawful under this subsection for a person to sponsor or exhibit a bird in the fighting venture *only if the person knew* that any bird in the fighting venture was knowingly bought, sold, delivered, transported, or received in interstate or foreign commerce for the purpose of participation in the fighting venture.") (Emphasis added).

*United States v. Langley*, 62 F.3d 602, 605–06 (4th Cir. 1995) (conviction under felon-in-possession statute, 18 U.S.C. § 922(g)(1), does not require knowledge of firearm's interstate nexus as an element of the offense); *United States v. Darby*, 37 F.3d 1059, 1067 (4th Cir. 1994) (conviction for transmitting threatening interstate communications, 18 U.S.C. § 875(c), does not require proof of knowledge that threatening telephone call was an interstate call); *United States v. Squires*, 581 F.2d 408, 410 (4th Cir. 1978) (conviction under National Stolen Property Act, 18 U.S.C. § 2314, does not require proof of knowledge of interstate nature of transportation of counterfeit securities).

As these decisions plainly illustrate, "criminal statutes based on the government's interest in regulating interstate commerce do not generally require that an offender have knowledge of the interstate nexus of his actions." *Darby*, 37 F.3d at 1067. Accordingly, we agree with the district court that the animal fighting statute does not require that the government establish a defendant's knowledge that the animal fighting venture was in or affecting interstate commerce.

## IV.

In conclusion, we hold that the animal fighting statute prohibits activities that substantially affect interstate commerce and, thus, is a legitimate exercise of Congress' power under the Commerce Clause. We also hold that the district court correctly concluded that the government was not required to establish the defendants' knowledge that the particular animal fighting venture was in or affecting interstate commerce. Therefore, we affirm the defendants' convictions.

*AFFIRMED*