**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

     *Plaintiff-Appellee,*

v.

SCOTT EDWARD LAWSON,

     *Defendant-Appellant.*

THE UNITED GAMEFOWL BREEDERS
ASSOCIATION,

     *Amicus Supporting Appellant,*

THE HUMANE SOCIETY OF THE
UNITED STATES,

     *Amicus Supporting Appellee.*

No. 10-4831

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

        v.

SHERI M. HUTTO,

        *Defendant-Appellant.*

THE UNITED GAMEFOWL BREEDERS
ASSOCIATION,

        *Amicus Supporting Appellant,*

THE HUMANE SOCIETY OF THE
UNITED STATES,

        *Amicus Supporting Appellee.*

No. 10-4841

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

        v.

WAYNE HUGH HUTTO,

        *Defendant-Appellant.*

THE UNITED GAMEFOWL BREEDERS
ASSOCIATION,

        *Amicus Supporting Appellant,*

THE HUMANE SOCIETY OF THE
UNITED STATES,

        *Amicus Supporting Appellee.*

No. 10-4845

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

        v.

LESLIE WAYNE PEELER,

        *Defendant-Appellant.*

THE UNITED GAMEFOWL BREEDERS
ASSOCIATION,

        *Amicus Supporting Appellant,*

THE HUMANE SOCIETY OF THE
UNITED STATES,

        *Amicus Supporting Appellee.*

No. 10-4846

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

        v.

NANCY ELIZABETH DYAL,

        *Defendant-Appellant.*

THE UNITED GAMEFOWL BREEDERS
ASSOCIATION,

        *Amicus Supporting Appellant,*

THE HUMANE SOCIETY OF THE
UNITED STATES,

        *Amicus Supporting Appellee.*

No. 10-4870

UNITED STATES OF AMERICA,

          *Plaintiff-Appellee,*

          v.

JAMES MORROW COLLINS, JR.,

          *Defendant-Appellant.*

 

THE UNITED GAMEFOWL BREEDERS
ASSOCIATION,

          *Amicus Supporting Appellant,*

THE HUMANE SOCIETY OF THE
UNITED STATES,

          *Amicus Supporting Appellee.*

No. 10-4882

Appeals from the United States District Court
for the District of South Carolina, at Columbia.
Cameron McGowan Currie, District Judge.
(3:09-cr-01174-CMC-9; 3:09-cr-01169-CMC-2;
3:09-cr-01169-CMC-3; 3:09-cr-01174-CMC-3;
3:09-cr-01169-CMC-1; 3:09-cr-01295-CMC-2)

Argued: January 24, 2012

Decided: April 20, 2012

Before GREGORY and KEENAN, Circuit Judges, and
Liam O'GRADY, United States District Judge for the
Eastern District of Virginia, sitting by designation.

Affirmed in part, vacated in part, and remanded by published
opinion. Judge Keenan wrote the opinion, in which Judge
Gregory and Judge O'Grady joined.

## COUNSEL

**ARGUED:** Clarence Rauch Wise, Greenwood, South Carolina; Jonathan McKey Milling, MILLING LAW FIRM, LLC, Columbia, South Carolina; Douglas Neal Truslow, Columbia, South Carolina, for Appellants. Nathan S. Williams, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee. **ON BRIEF:** John Dennis Delgado, BLUESTEIN, NICHOLS, THOMPSON & DELGADO, LLC, Columbia, South Carolina, for Appellant Sheri M. Hutto; Swepson Harrison Saunders, VI, Columbia, South Carolina, for Appellant Leslie Wayne Peeler; Henry Wesley Kirkland, Jr., KIRKLAND & RUSH, Columbia, South Carolina, for Appellant Nancy Elizabeth Dyal. William N. Nettles, United States Attorney, Columbia, South Carolina, for Appellee. Mark L. Pollot, Boise, Idaho, for The United Gamefowl Breeders Association, Amicus Supporting Appellants. Jonathan R. Lovvorn, Kimberly D. Ockene, Aaron D. Green, THE HUMANE SOCIETY OF THE UNITED STATES, Washington, D.C.; Emily L. Aldrich, HUNTON & WILLIAMS LLP, Los Angeles, California; Gregory N. Stillman, HUNTON & WILLIAMS LLP, Norfolk, Virginia; Joseph P. Esposito, William E. Potts, Jr., Andrew E. Walsh, HUNTON & WILLIAMS LLP, Washington, D.C., for The Humane Society of the United States, Amicus Supporting Appellee.

## OPINION

BARBARA MILANO KEENAN, Circuit Judge:

Scott Lawson and certain other defendants (collectively, Lawson) were convicted by a jury of violating, and conspiring to violate, the animal fighting prohibition of the Animal Welfare Act, 7 U.S.C. § 2156(a) (the animal fighting statute), resulting from their participation in "gamefowl derbies," otherwise known as "cockfighting." The animal fighting statute

prohibits, among other things, "sponsor[ing] or exhibit[ing] an animal in an animal fighting venture." *Id.* The term "animal fighting venture" is defined in the statute, in relevant part, as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(g)(1). Several of the defendants in this case also were convicted of participating in, and conspiring to participate in, an illegal gambling business in violation of 18 U.S.C. § 1955 (the illegal gambling statute), with relation to activities that occurred during the "derbies."

Lawson raises numerous challenges to his convictions, arguing that: (1) the convictions for violating the animal fighting statute should be vacated because Congress lacks power under the Commerce Clause to prohibit the fighting of gamefowl; (2) the animal fighting statute is unconstitutional because the statute provides for different elements of proof in jurisdictions where animal fighting is legal; (3) the district court abused its discretion in consolidating Scott Lawson's trial with the trials of his co-defendants; and (4) a juror's misconduct in performing unauthorized research of the definition of an element of the offense on Wikipedia.org (Wikipedia), an "open access" internet encyclopedia, deprived him of his Sixth Amendment right to a fair trial. Additionally, the defendants convicted of violating the illegal gambling statute raise several challenges to those convictions.[1]

Upon our review of the parties' arguments, we hold that the animal fighting statute is a constitutional exercise of Congress' power under the Commerce Clause; that the provision

---

[1]Lawson further argues that the district court erred in its rulings with respect to certain evidentiary matters and the instructions given to the jury on the animal fighting statute charges. In light of our holding, we do not reach those issues. We also do not reach the argument made by James Collins, Jr., that the district court erred in its application of the sentencing guidelines.

of different elements of the crime in jurisdictions permitting animal fighting does not violate Lawson's equal protection rights; and that the district court did not err in conducting Scott Lawson's trial jointly with the trials of his co-defendants. However, we hold that the juror's misconduct violated Lawson's right to a fair trial, and we therefore vacate the convictions for violating the animal fighting statute. For this reason, we also vacate the conspiracy convictions with respect to those defendants for which the conspiracy alleged related solely to the animal fighting activities. Additionally, we reject the challenges made by several of the defendants to the illegal gambling convictions, and we affirm the convictions relating to those offenses as well as the conspiracy convictions for which illegal gambling was one of the objects of the conspiracy alleged.

I.

In November 2009, a federal grand jury returned an indictment against Lawson and Leslie Wayne Peeler (the Lawson indictment),[2] alleging one count of participating in a conspiracy to violate the Animal Welfare Act, in violation of 18 U.S.C. § 371, and one count of participating in, and/or aiding and abetting, an unlawful animal fighting venture, in violation of 7 U.S.C. § 2156(a)(1) and 18 U.S.C. § 2. With respect to

---

[2]The indictment named as Lawson's and Peeler's co-defendants Jeffrey Brian Gibert, Michael Monroe Grooms, Gerald Benfield, John Carlton Thurman Hoover, Michael T. Rodgers, Johnny Junior Harrison, Coy Dale Robinson, Jimmie Jesse Hicks, and George William Kelly, alleging that they committed various acts in connections with the derbies held in Swansea in July 2008 and April 2009. Peeler is a co-party to Lawson's appeal, and, like Lawson, proceeded to a trial by jury. Gibert, Grooms, Benfield, and Hoover (collectively Gibert) entered conditional guilty pleas and have appealed their convictions in a companion case, *United States v. Gibert*, No. 10-4848, ___ F.3d ___ (4th Cir. Apr. 20, 2012). Lawson's appeal and Gibert's appeal proceeded on separate briefing schedules, but this Court consolidated the two cases for purposes of oral argument. Because the two cases raise certain distinct legal issues, we are concurrently issuing separate opinions for the two cases.

the conspiracy charge, the Lawson indictment alleged that Lawson offered gaffs for sale and sharpened gaffs for individuals who entered birds into a cockfighting event held in Swansea, South Carolina in July 2008, and that Peeler served as a referee for a cockfighting event held in Swansea in April 2009. With respect to the violations of the animal fighting statute that did not involve an alleged conspiracy, the indictment alleged generally that Lawson and Peeler sponsored and exhibited an animal, or aided and abetted individuals who sponsored an animal, in an animal fighting venture that occurred in July 2008, and April 2009, respectively.

The grand jury returned a separate indictment in November 2009 against Nancy Elizabeth Dyal, Sheri M. Hutto, and Wayne Hugh Hutto (the Dyal indictment), alleging one count of participating in a conspiracy to violate the Animal Welfare Act and to engage in an illegal gambling business, in violation of 18 U.S.C. § 371, two counts of participating in, and/or aiding and abetting, an unlawful animal fighting venture, in violation of 7 U.S.C. § 2156(a)(1) and 18 U.S.C. § 2, and two counts of participating in, and/or aiding and abetting, an illegal gambling business, in violation of 18 U.S.C. § 1955 and 18 U.S.C. § 2. A similar indictment was returned against James Morrow Collins, Jr. in December 2009,[3] alleging the same five counts as alleged in the Dyal indictment, based on Collins' alleged role in the Swansea derbies held in July 2008 and April 2009.

With respect to the conspiracy charge, these indictments alleged that Dyal, Sheri Hutto, Wayne Hutto, and Collins each helped organize the derbies held in Swansea in July 2008 and April 2009. These indictments were based on Sheri Hutto's alleged acts of announcing the scheduled fighters; Dyal's alleged acts of collecting admission fees, checking identifica-

---

[3]This indictment named Gene Audry Jeffcoat as Collins' co-defendant. Jeffcoat entered a guilty plea to the charges, and is a party in the *Gibert* companion case.

tions for membership in the South Carolina Gamefowl Breed-ers Association, and selling such memberships during the derbies; Wayne Hutto's alleged acts of serving as a referee for the fights; and Collins' alleged acts of handling money and ensuring that the rules were followed. With respect to viola-tions of the animal fighting statute that did not involve a con-spiracy, these indictments alleged generally that Dyal, Sheri Hutto, and Wayne Hutto sponsored and exhibited an animal, or aided and abetted individuals who sponsored an animal, in an animal fighting venture that occurred in July 2008 and April 2009, respectively. With respect to the illegal gambling statute charges, these indictments alleged that the nature of the derby, in which owners of fighting birds paid an entry fee to enter the birds in the derby and were eligible to win a "purse" if their birds won the most fights, constituted an ille-gal gambling operation in violation of South Carolina Code sections 16-19-10 and 16-19-130.

The indictments stemmed from an undercover investigation conducted by the South Carolina Department of Natural Resources of a cockfighting organization based in Swansea. Undercover officers attended and made video recordings of two cockfighting derbies, held in July 2008 and April 2009. During these derbies, several individuals, including individu-als alleged to be part of the conspiracy at issue, entered birds into cockfighting matches. In these matches, the birds were "equipped" with gaffs or other sharp, metal objects attached to their legs. The birds fought their opponent to the death or at least until one of the birds was physically incapable of con-tinuing to fight. After paying an entry fee to enter a bird in the derby, an owner was eligible to win the "purse," the collective money put up by the entrants minus any amount retained by the organizers, if the owner's bird won the most fights.

The district court consolidated the indictments for these defendants and conducted a single trial, over Scott Lawson's objection. During the course of the five-day trial, the parties called twenty-four witnesses, a majority of whom were repre-

sentatives of companies outside South Carolina that manufactured items used in the cockfights. The government presented this testimony to help establish a nexus between the cockfighting activities at issue and interstate commerce, as required by the elements of 7 U.S.C. § 2156.[4] *See* 7 U.S.C. § 2156(g) (defining "animal fighting venture" as "any event, in or affecting interstate or foreign commerce . . . .").

After about nine hours of deliberations conducted over two days, the jury returned a verdict finding all defendants guilty on all counts. As discussed in greater detail in this opinion, the district court was informed several days after the verdict that one of the jurors had conducted unauthorized research on the internet during an overnight recess in the jury deliberations. The district court ordered a hearing, in which it was determined that a juror researched on Wikipedia the definition of "sponsor," one of the elements of the offense under the animal fighting statute. After the hearing, the district court entered a written order, finding that the juror had committed misconduct but that the defendants were not prejudiced by the juror's actions.[5] Accordingly, the district court denied the defendants' motion for a new trial.

The district court sentenced Scott Lawson and Peeler to a term of three years' probation and a monetary fine. The district court sentenced Dyal, Sheri Hutto, and Wayne Hutto each to a term of imprisonment of 12 months and one day. The district court determined that Collins was a leader or organizer of the conspiracy, adjusted his guidelines range accordingly, denied his motion to reduce his guidelines range

---

[4]The government introduced other categories of evidence to establish an interstate commerce nexus, including bank records showing that money collected at the event was deposited into a bank account, and that checks drawing on those funds were processed outside South Carolina.

[5]In this order, the district court also rejected the defendants' motion for judgment of acquittal, in which they argued that the evidence was insufficient to sustain their convictions.

for acceptance of responsibility, and sentenced him to a term of imprisonment of 21 months, in addition to a monetary fine. All defendants filed timely notices of appeal.

## II.

Lawson first argues that his convictions for violating the animal fighting statute should be vacated because Congress lacks power under the Commerce Clause to prohibit the fighting of gamefowl. We addressed this identical argument in *United States v. Gibert*, No. 10-4848, ___ F.3d ___ (4th Cir. Apr. 20, 2012), a companion case that we consolidated with Lawson's appeal, for which we are issuing an opinion concurrently with our decision in this case.[6] In *Gibert*, we hold that the activity of animal fighting substantially affects interstate commerce and, thus, is a subject that Congress has the power to regulate under the Commerce Clause. For the reasons stated in our opinion in *Gibert*, we reject Lawson's argument that 7 U.S.C. § 2156 is an unconstitutional exercise of Congress' powers under the Commerce Clause.

## III.

Lawson next argues that the animal fighting statute is unconstitutional because the statute provides for different elements of proof in different jurisdictions. We review this issue of law de novo. *United States v. Cheek*, 94 F.3d 136, 140 (4th Cir. 1996).

As Lawson correctly observes, under the animal fighting statute, if a defendant lives in a jurisdiction where gamefowl fighting is legal under the laws of that jurisdiction, the government must prove as an additional element of the offense that the defendant knew that at least one bird in the fighting

---

[6]*Gibert* involves the same animal fighting venture at issue in this case. The defendants in *Gibert* each entered guilty pleas, whereas the defendants in this case proceeded to trial and were convicted by a jury.

venture traveled in interstate or foreign commerce. *See* 7 U.S.C. § 2156(a)(2). In contrast, if a defendant lives in a jurisdiction that prohibits gamefowl fighting, the government need only prove that the defendant sponsored or exhibited an animal in an animal fighting venture, irrespective whether the bird traveled in interstate or foreign commerce. *See* 7 U.S.C. § 2156(a)(1). Lawson contends that this variation in the elements of the crime constitutes a violation of his equal protection rights under the Fifth Amendment's Due Process Clause.[7] We disagree with Lawson's argument.

In analyzing whether a statute's classification violates an individual's equal protection rights, we first analyze the nature of the classification and the type of activity regulated. If a statute classifies a person or group by race, alienage, or national origin, or if the activity impinges upon a fundamental right protected by the Constitution, the statute is subject to strict scrutiny review, and will be sustained only if the statute is narrowly tailored to serve a compelling governmental interest. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985); *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). However, if the statute's classification is unrelated to race, alienage, or national origin, and does not affect a fundamental right, the statute generally is subject to rational basis

---

[7]Although the Fifth Amendment does not contain an explicit equal protection clause as is provided in the Fourteenth Amendment, the Supreme Court has interpreted the Fifth Amendment's due process clause as incorporating an equal protection aspect. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217, 224 (1995) (discussing equal protection aspect of the Fifth Amendment's due process clause). The Supreme Court has held that the method of analyzing equal protection claims brought under the Fifth Amendment is no different than the analysis of such claims under the Fourteenth Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."); *see also United States v. Jones*, 735 F.2d 785, 792 n.8 (4th Cir. 1984) (same).

review and will be upheld if the statute is rationally related to a legitimate governmental interest.[8] *Id.*

In this case, the statute relates to animal fighting, which is not a fundamental right. The statute classifies people on the basis of the location where they conduct their animal fighting activities, which is not a suspect classification. Accordingly, as Lawson concedes, if the statute's classification is rationally related to a legitimate governmental interest, his equal protection challenge fails.

We conclude that the challenged classification is rationally related to a legitimate government purpose. The increased evidentiary burden on the government arises only if gamefowl fighting is legal under the laws of the "State" in which the gamefowl fighting occurred. The term "State" in the statute includes not only the 50 states of the United States but also "the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States." 7 U.S.C. § 2156(g)(3). Currently, although cockfighting is illegal in all 50 States and the District of Columbia, cockfighting remains legal in several United States territories such as Guam and Puerto Rico.[9]

It is readily apparent that the statute's additional evidentiary burden, which requires the government to prove actual knowledge of interstate transportation of birds in cases in which the animal fighting occurred in a "state" where animal fighting remains legal, merely reflects the fact that certain

---

[8]Statutes that classify on the basis of gender are subject to "intermediate scrutiny," and will be upheld if the statutory classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *H.B. Rowe Co., Inc. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)).

[9]*See* Humane Society, *Cockfighting: State Laws Fact Sheet*, *available at* http://www.humanesociety.org/assets/pdfs/cockfighting_chart_2011.pdf (updated June 2010).

jurisdictions have not proscribed cockfighting within their borders. Thus, we conclude that the disparate treatment complained of by Lawson was occasioned by the decision of Congress to accommodate principles of federalism, a concern that unquestionably is a legitimate governmental interest. *See United States v. Bagheri*, 999 F.2d 80, 86 (4th Cir. 1993) (conducting rational basis review and holding that "[p]rinciples of federalism justify following the distinction drawn under Maryland law between sentences actually expunged and those unexpunged but expungeable"); *see also Benjamin v. Jacobson*, 172 F.3d 144, 165 (2d Cir. 1999) (applying rational basis review and concluding that principles of federalism and judicial restraint underlying congressional statute are legitimate purposes); *Gavin v. Branstad*, 122 F.3d 1081, 1090 (8th Cir. 1997) (principle of federalism is a legitimate governmental interest for purposes of rational basis review); *United States v. Cohen*, 733 F.2d 128, 137 (D.C. Cir. 1984) (en banc) ("It would be enough, for purposes of 'rational basis' analysis, merely that [the substantial concern of federalism] *could have* underlain the congressional reluctance to legislate more broadly.") (emphasis in original); *Eskra v. Morton*, 524 F.2d 9, 18 (7th Cir. 1975) ("there are several possible rational bases for the congressional scheme of incorporation of state law, including congressional considerations of federalism"). Accordingly, we reject Lawson's equal protection challenge to the animal fighting statute.

## IV.

We next consider the district court's decision joining Scott Lawson's trial with the trials of his co-defendants. Scott Lawson maintains that the district court erred in refusing to grant him a separate trial under Rule 14 of the Federal Rules of Criminal Procedure, which provides that a district court may grant a severance if it appears that a defendant may be "prejudice[d]" by a joinder of offenses or of defendants. We disagree with Scott Lawson's argument.

A district court "may order that separate cases be tried together as though brought in a single indictment or information if all offenses and all defendants could have been joined in a single indictment or information." Fed. R. Crim. P. 13. A group of defendants "could have been joined in a single indictment" if they "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b).

Such is the case here, because the indictments against Scott Lawson and his co-defendants allege that they were all involved in the same acts and transactions with respect to the same animal fighting venture and conspiracy.[10] Accordingly, the district court was permitted to exercise its discretion to join Scott Lawson's trial with the trials of his co-defendants.

Joint trials promote efficiency and "play a vital role in the criminal justice system." *Richardson v. Marsh*, 481 U.S. 200, 209 (1987). Joinder is highly favored in conspiracy trials, such as the present case. *United States v. Chorman*, 910 F.2d 102, 114 (4th Cir. 1990); *see also United States v. Ford*, 88 F.3d 1350, 1361 (4th Cir. 1996) ("For reasons of efficiency and judicial economy, courts prefer to try joint-conspirators together.").

A district court's decision to deny a motion for separate trials will be overturned only for a "clear abuse of discretion." *Chorman*, 910 F.2d at 114. We will find a "clear abuse" of the district court's discretion only in cases in which the district court's denial of such a motion "deprives the defendant of a fair trial and results in a miscarriage of justice." *Id.* (citations and internal quotation marks omitted). Upon our review of the

---

[10]We observe that Scott Lawson was not charged with any gambling-related offenses, whereas his co-defendants other than Peeler faced such charges. Scott Lawson does not rely in his argument on the fact that his co-defendants faced the additional charges relating to gambling.

record, we conclude that Scott Lawson cannot show that he was deprived of a fair trial or that a miscarriage of justice occurred. Accordingly, we hold that the district court did not abuse its discretion in joining the charges against Scott Lawson for trial with his co-defendants.

## V.

We next consider Lawson's argument that he is entitled to a new trial because a juror committed misconduct by researching on Wikipedia the term "sponsor," an element of the crimes charged under the animal fighting statute. According to Lawson, the juror's misconduct violated Lawson's Sixth Amendment right to a fair trial. We review the district court's decision denying Lawson's motion for a new trial pursuant to a "somewhat narrowed, modified abuse of discretion standard," under which we have "more latitude to review the trial court's conclusion in this context than in other situations." *Cheek*, 94 F.3d at 140 (citation and internal quotation marks omitted). However, we review any issues of law relevant to this question de novo. *Id.*

## A.

Six days after the jury returned its verdict finding Lawson guilty on all charges, one of the jurors, Juror 1, informed a courtroom security officer of potential juror misconduct. Juror 1 stated that another juror, Juror 177, had consulted certain internet sources the morning before the jury reached its verdict. As later found by the district court, this information included the definition of the term "sponsor" that appeared on Wikipedia.[11]

---

[11]Juror 177 also researched the definition of the term "exhibit," an alternative element of the offense, on Merriam-Webster.com, the internet version of the Merriam-Webster dictionary. While several members of the jury were aware that Juror 177 had researched the term "sponsor," none of the jurors was aware that Juror 177 also had engaged in research of the term "exhibit." Because the juror's use of Wikipedia for the term "sponsor," standing alone, is determinative of the result we reach on the issue of juror misconduct, we focus our analysis only on the juror's use of Wikipedia.

Juror 177 used a computer printer at his home to reproduce the Wikipedia entry for the term "sponsor," and later brought the printout to the jury room when the deliberations resumed. Juror 177 shared the printout with the jury foreperson, Juror 185, and also attempted to show the material to other jurors, but was stopped when some of them told him it would be inappropriate to view the material. These actions violated the explicit instructions of the district court, which had admonished the jurors not to conduct any outside research about the case, including research on the internet.[12]

After being informed about Juror 177's conduct, the district court held a hearing to determine whether the verdict had been tainted by Juror 177's actions. The district court questioned each of the twelve jurors who had served on the panel for Lawson's trial. During his testimony,[13] Juror 177 admitted that he had conducted internet research, and had brought material obtained on the internet into the jury room during the jury deliberations.

At the time of the hearing, which occurred nineteen days after the jury reached its verdict, Juror 177 no longer was in possession of his original printout of the Wikipedia entry. Nevertheless, Juror 177 provided the district court with documents obtained from Wikipedia a few days before the hearing,

---

[12]The court's careful oral and written instructions admonished the jury as follows: "I remind you that during your deliberations, you must not communicate with or provide any information to anyone by any means about this case. *You may not use any electronic device or media, such as* a telephone, cell phone, smart phone, iPhone, Blackberry or computer; *the internet, any internet device*, or any text or instant messaging service; or any internet chat room, blog, or website such as Facebook, MySpace, LinkedIn, YouTube, or Twitter, to communicate to anyone any information about this case or *to conduct any research about this case* until I accept your verdict." (Emphasis added.)

[13]In light of the potential for contempt sanctions, the district court appointed counsel to advise Juror 177 whether he should testify at the hearing.

purportedly after using the same method he had employed in obtaining the original printout brought to the jury room.[14]

Despite Juror 177's efforts to "retrace" his steps, the district court observed that the material Juror 177 brought to the hearing was somewhat different than the material he produced during the jury deliberations:

> Because the documents provided to the court were "recreated" after trial, the court cannot determine with certainty that the documents shown in Court Ex. 1 are in precisely the same form and contain precisely the same content as the documents which Juror 177 brought to the deliberations. The court is, nonetheless, persuaded that the definitions found on Court Ex. 1 are in essentially the same form as those brought in by Juror 177, *although there has been at least some change to the Wikipedia definition of "sponsor."*[15]

(Emphasis added.)

During his testimony, Juror 177 admitted discussing his research with Juror 185, but denied that he had shared the information with any of the other jurors. Additionally, Juror 177 testified that he did not recall any of the other jurors stating that it would be improper to consider outside materials. Juror 177 further testified that the definitions he obtained did not influence him in deciding the case.

---

[14]The printed material consisted of two items: a one-page document from the "Free [Merriam] Webster Dictionary" defining the word "exhibit," and a three-page document from Wikipedia that included a definition and explanation of "Sponsor (Commercial)".

[15]The district court provided no explanation for its conclusion that the definitions brought to the hearing were "in essentially the same form" as the definitions obtained during jury deliberations.

Although Juror 177 stated that he shared the information only with Juror 185, at least one other juror testified that Juror 177 also had shared the information with different jurors. Three jurors testified that they saw Juror 177 produce, or attempt to produce, the printed definitions to share with the jury before he was told by the group that using the material would be inappropriate. Additionally, six jurors heard Juror 177 discuss that he had conducted research on the internet about a term at issue in the case.

The district court found that Juror 177 "may have orally shared some portion of the definition with the other jurors." Additionally, the district court found that portions of Juror 177's testimony were discredited by the testimony of other jurors. The district court concluded that Juror 177's actions amounted to misconduct.[16]

Nevertheless, the district court denied Lawson's motion for a new trial. The district court employed the five-factor test announced by the Tenth Circuit in *Mayhue v. St. Francis Hospital of Wichita, Inc.*, 969 F.2d 919 (10th Cir. 1992), which this Court also has applied, to assess whether Juror 177's misconduct prejudiced Lawson. In applying these factors, the district court did not address Lawson's argument that he was entitled to a presumption of prejudice. The district court concluded that there was "no reasonable possibility that the external influence caused actual prejudice," and thus denied Lawson's motion.

B.

Lawson argues that Juror 177's unauthorized use of Wikipedia entitled him to a rebuttable presumption of prejudice under *United States v. Remmer*, 347 U.S. 227 (1954), and

---

[16]The district court later found Juror 177 in contempt of court, and ordered him to pay a monetary fine and to complete fifty hours of community service.

that the district court erred in not affording him such a presumption.[17] The issue whether the juror's use of Wikipedia created a rebuttable presumption of prejudice is a question of law that we review de novo. *See Cheek*, 94 F.3d at 140.

In *Remmer*, the Supreme Court held that a rebuttable presumption of prejudice arose from a third party's unauthorized communication with a juror during the trial.[18] 347 U.S. at 229. In announcing this rule, the Court stated that "any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, *deemed presumptively prejudicial*." *Id.* at 229 (emphasis added). However, the Court cautioned that this "presumption of prejudice" did not establish a per se requirement of a new trial. *Id.* The Court stated that "[t]he presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Id.*

i.

Before we address the question whether the *Remmer* rebuttable presumption is applicable to a juror's unauthorized reference to a Wikipedia entry, we first must consider whether that presumption has been altered by more recent Supreme Court decisions. While the Supreme Court has not departed explicitly from its holding in *Remmer*, there is a split among the circuits regarding the issue whether the *Remmer* presump-

---

[17]We observe that the government failed to address in its brief Lawson's "presumption of prejudice" argument, despite the fact that Lawson devoted eight pages in his briefs to that argument.

[18]In *Remmer*, a juror reported to the judge that an unknown individual attempted to bribe him. 347 U.S. at 228. The Federal Bureau of Investigation conducted an investigation and concluded that the contact was made in jest. *Id.* The judge consulted with the prosecutors, who agreed that the contact was harmless, but defense counsel apparently was not included in these discussions. *Id.*

tion has survived intact following certain later Court decisions.

At issue in this debate are the Supreme Court's decisions in *Smith v. Phillips*, 455 U.S. 209 (1982), and *United States v. Olano*, 507 U.S. 725 (1993). In *Phillips*, a habeas corpus appeal presenting questions of bias concerning a juror who had applied for a job in the prosecutor's office, the Supreme Court held that due process required that the trial court hold a hearing during which "the *defendant* has the opportunity to prove actual bias." 455 U.S. at 215 (emphasis added). In *Olano*, a direct appeal involving a trial court's decision to allow alternate jurors to be present during jury deliberations, the Supreme Court cited *Remmer* while observing that "[t]here may be cases where an intrusion should be presumed prejudicial, but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?" 507 U.S. at 739 (internal citations omitted).

Because *Olano* was a case decided on direct appeal, we take particular note of that decision here. From our reading of *Olano*, we conclude that the Supreme Court's discussion, of the "ultimate inquiry" to be performed in cases involving "intrusions" into a jury's deliberations, suggests that this inquiry may be framed either as a rebuttable presumption or as a specific analysis of the intrusion's effect on the verdict. *See id.*

This Court's decisions addressing such external influences on a jury's deliberations reflect that the *Remmer* rebuttable presumption remains live and well in the Fourth Circuit. In *Stockton v. Virginia*, 852 F.2d 740, 742-43 (4th Cir. 1988), we cited *Remmer* and applied the rebuttable presumption in a case involving a restaurant owner's comments to a few members of the jury, eating at the restaurant during a break in sentencing deliberations, that "they ought to fry the son of a bitch."

In applying the *Remmer* analysis, and in granting the defendant a new sentencing hearing because the government failed to rebut the presumption, we expressly held in *Stockton* that the Supreme Court's decision in *Phillips* did not overturn the holding in *Remmer*. We distinguished the facts presented in *Phillips*, and concluded that in cases in which "the danger is not one of juror impairment or predisposition, but rather the effect of an extraneous communication upon the deliberative process of the jury," the *Remmer* presumption is applicable. *Stockton*, 852 F.2d at 744.

Similarly, in *Cheek*, we applied the *Remmer* presumption after the Supreme Court's decision in *Olano* and awarded the defendant a new trial in a case involving a bribe attempt on one of the jurors. 94 F.3d at 138. We stated that once a defendant introduces evidence that there was an extrajudicial communication that was "more than innocuous," the *Remmer* presumption is "triggered automatically," and "[t]he burden then shifts to the [government] to prove that there exists no 'reasonable possibility that the jury's verdict was influenced by an improper communication.'" *Cheek*, 94 F.3d at 141 (quoting *Stephens v. S. Atl. Canners, Inc.*, 848 F.2d 484, 488-89 (4th Cir. 1988)).

We most recently discussed and applied the *Remmer* presumption in *United States v. Basham*, 561 F.3d 302 (4th Cir. 2009). The decision in *Basham* involved a juror who had contacted several news media outlets during the penalty phase of the trial. *Id.* at 316. In holding that Basham was not entitled to a new trial as a result of the juror's misconduct, we applied the *Remmer* presumption using the analysis set forth in *Cheek*, and concluded that the district court did not err in holding that the government had rebutted the presumption. *Id.* at 319-21; *see also United States v. Blauvelt*, 638 F.3d 281, 294-95 (4th Cir. 2011) (discussing the *Remmer* presumption of prejudice but holding it inapplicable to a juror's "innocuous" email exchange, concerning a wholly unrelated subject, with an

assistant federal prosecutor who was not involved in defendant's trial).

We have been joined by several of our sister circuits, including the Second, Seventh, Ninth, Tenth, and Eleventh Circuits, in continuing to apply the *Remmer* presumption in cases involving external influences on jurors. *See United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2002) (citing *Remmer* for proposition that "[i]t is well-settled that any extra-record information of which a juror becomes aware is presumed prejudicial" and that "[a] government showing that the information is harmless will overcome this presumption"); *United States v. Moore*, 641 F.3d 812, 828 (7th Cir. 2011) (same); *United States v. Dutkel*, 192 F.3d 893, 895-96 (9th Cir. 1999) (applying *Remmer* presumption in jury tampering case and disagreeing that the presumption has been abrogated); *Mayhue*, 969 F.2d at 922 (10th Cir.) ("The law in the Tenth Circuit is clear. A rebuttable presumption of prejudice arises whenever a jury is exposed to external information in contravention of a district court's instructions."); *United States v. Ronda*, 455 F.3d 1273, 1299 (11th Cir. 2006) (if defendant establishes that jury has been exposed to extrinsic evidence or contacts, "prejudice is presumed and the burden shifts to the government to rebut the presumption"); *see also United States v. Bradshaw*, 281 F.3d 278, 287-88 (1st Cir. 2002) (observing that the *Remmer* presumption is still applicable in First Circuit "only where there is an egregious tampering or third party communication which directly injects itself into the jury process") (citation omitted); *United States v. Lloyd*, 269 F.3d 228, 238 (3d Cir. 2001) (applying presumption of prejudice when a jury is exposed to extraneous information "of a considerably serious nature").

We note, however, that in contrast to these decisions applying the *Remmer* presumption, the Fifth, Sixth, Eighth, and District of Columbia Circuits have departed from use of the presumption. These circuits have taken this contrary position based on their view of *Phillips* and *Olano*. *See United States*

*v. Sylvester*, 143 F.3d 923, 933-35 (5th Cir. 1998) (holding that *Phillips* and *Olano* effectively rejected *Remmer*'s rebuttable presumption, and that "only when the [trial] court determines that prejudice is likely should the government be required to prove its absence"); *United States v. Williams-Davis*, 90 F.3d 490, 495-97 (D.C. Cir. 1996), (holding that *Phillips* and *Olano* narrowed the *Remmer* presumption, and that trial court must determine whether particular intrusion showed "likelihood of prejudice," which would place on the government the burden of proving harmlessness); *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984) (holding that *Phillips* altered law such that *Remmer* rebuttable presumption is no longer applicable, and that burden to establish prejudice rests with defendant); *see also United States v. Blumeyer*, 62 F.3d 1013, 1017 (8th Cir. 1995) (citing *Olano* for proposition that defendant has burden to prove actual prejudice in cases involving extrinsic juror contact pertaining to issues of law, but not to issues of fact).

ii.

a.

The continued vitality of *Remmer* in this Circuit, however, does not resolve the question whether the presumption is applicable in cases involving a juror's unauthorized use of Wikipedia. Initially, we observe that an allegation of jury tampering or of a juror's contact with a third party, such as the incidents that occurred in *Remmer*, *Stockton*, *Cheek*, and *Basham*, is of a much different character than a juror's unauthorized use of a dictionary during jury deliberations. Although we previously have considered incidents in which a juror committed misconduct by consulting a dictionary, as described below, the question whether a rebuttable presumption of prejudice arises in such a situation is an issue of first impression in this Court in a case presented on direct appeal.

We first encountered a situation involving a juror's unauthorized use of a dictionary in *United States v. Duncan*, 598

F.2d 839 (4th Cir. 1979), a direct appeal involving a juror's reference during jury deliberations to dictionary definitions of the terms "motive" and "intent". *Id.* at 866. In our abbreviated discussion in which we rejected Duncan's argument that he was entitled to a new trial on that basis, we observed that "[w]hile reference to the dictionary was misconduct, it was not prejudicial *per se*," as Duncan had argued. *Id.* (emphasis added). The question whether such misconduct raised a rebuttable presumption of prejudice was not at issue in *Duncan*.

We also addressed jurors' unauthorized use of a dictionary in two habeas corpus appeals, *McNeill v. Polk*, 476 F.3d 206 (4th Cir. 2007), and *Bauberger v. Haynes*, 632 F.3d 100 (4th Cir. 2011). Because those cases involved petitions for habeas corpus relief, the analysis we employed was restricted by the provisions of 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).[19] *See Vigil v. Zavaras*, 298 F.3d 935, 941 n.6 (10th Cir. 2002) (explaining that although on direct appeal, rebuttable presumption of prejudice arises when jury is exposed to unauthorized external information, this presumption is inapplicable in habeas context). Although our standard of review in *McNeill* and *Bauberger* was different from the standard we use in the present direct appeal, one particular aspect of those cases is particularly helpful here.

In *McNeill*, separate opinions authored by two of the panel's judges analyzed the issue of prejudice under factors identified by the Tenth Circuit in *Mayhue*, 969 F.2d 919, in considering the effect of a juror's unauthorized reference to a

---

[19]We routinely resolve petitions for a writ of habeas corpus by analyzing the petitioner's claims for "harmless error" under the demanding standard for such cases announced in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, a habeas petitioner may secure a writ only if he demonstrates that the error "actual[ly] prejudice[d]" him, which requires a showing that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

dictionary. *McNeill*, 476 F.3d at 226 (King, J., concurring in judgment); *id.* at 229 (Gregory, J., dissenting in judgment) (same). Similarly, in *Bauberger*, although our opinion did not refer directly to *Mayhue*, we cited portions of the opinions in *McNeill* that employed the *Mayhue* factors. *See Bauberger*, 632 F.3d at 106 (discussing factor used in Judge King's and Judge Gregory's separate opinions in *McNeill* that originated in *Mayhue*); *id.* at 108 (same); *id.* at 108-09 (same). We will discuss these *Mayhue* factors, on which the district court relied, later in this opinion.

b.

In resolving the question whether the *Remmer* presumption applies to a juror's use of a dictionary definition during deliberations, we note that our sister circuits also are divided on this question. In examining their holdings, a clear and predictable pattern is evident. Unsurprisingly, the courts that have applied a rebuttable presumption of prejudice in "dictionary" cases, or alternatively have held that the government bears the burden of establishing that no prejudice occurred, are among the courts that have rejected the view that *Remmer* has been abrogated. *See e.g.*, *Marino v. Vasquez*, 812 F.2d 499, 505 (9th Cir. 1987) (holding that unauthorized use of dictionary definitions is reversible error and that government must establish that error is harmless beyond reasonable doubt); *United States v. Aguirre*, 108 F.3d 1284, 1288 (10th Cir. 1997) (citing *Mayhue* for proposition that "jury's exposure to extrinsic information [such as a dictionary definition] gives rise to a rebuttable presumption of prejudice"); *United States v. Martinez*, 14 F.3d 543, 550 (11th Cir. 1994) (in case involving several categories of extrinsic evidence, including unauthorized use of dictionary to define terms discussed during deliberations, holding that "we assume prejudice and thus, we must consider whether the government rebutted that presumption"); *see also United States v. Console*, 13 F.3d 641, 665-66 (3d Cir. 1993) (applying presumption of prejudice in case in which juror discussed definition of RICO with her sister, an

attorney, and shared the attorney's definition with other jurors during deliberations).

In contrast, the courts that have declined to apply a presumption of prejudice in these "dictionary" cases are some of the same courts that have held that the *Remmer* rebuttable presumption of prejudice is no longer applicable.[20] *See e.g.*, *United States v. Gillespie*, 61 F.3d 457, 460 (6th Cir. 1995) ("if members of the jury in fact used the dictionary definition [to reach their verdict], the defendant must prove that he was prejudiced thereby; prejudice is not presumed"); *United States v. Cheyenne*, 855 F.2d 566, 568 (8th Cir. 1988) (if the jury "simply supplements the [trial] court's instructions of law with definitions culled from a dictionary, it remains within the province of the judge to determine" whether the defendant was prejudiced); *Williams-Davis*, 90 F.3d at 502-03 (D.C. Cir.) (holding presumption of prejudice inapplicable to juror's reading of a dictionary definition during deliberations).

Relying on our prior application of the *Remmer* presumption, *see Basham*, 561 F.3d at 319-21; *Cheek*, 94 F.3d at 141; *Stockton*, 852 F.2d at 744, we conclude this presumption likewise is applicable when a juror uses a dictionary or similar resource to research the definition of a material word or term at issue in a pending case. In reaching this conclusion, we observe that many of the concerns that arise when a juror discusses a case with a third party, such as the incident that occurred in *Basham*, are likewise concerns inherent in a juror's unauthorized use of a dictionary during jury deliberations. In both instances, a defendant's Sixth Amendment right to a fair trial is at issue, and the sanctity of the jury and its

---

[20]Additionally, the First Circuit examined a juror's use of a dictionary without mentioning *Remmer* or otherwise opining who bears the burden of establishing prejudice. *See United States v. Rogers*, 121 F.3d 12, 17 (1st Cir. 1997) (in case involving jurors use of a dictionary definition, for a term on which the district court issued a subsequent legal instruction, holding that "the district court must determine whether any misconduct has occurred and if so, whether it was prejudicial").

deliberations have been threatened. In both instances, an extrinsic influence has been injected into the trial, the content of which is beyond the trial court's ability to control. And, in both instances, the procedural and substantive protections that the law affords to the judicial process are limited.[21]

In the present case, the content of the extrinsic influence is of particularly great concern, because the Wikipedia definition of the term "sponsor" addressed an element of the animal fighting offenses for which the defendants were on trial. Thus, Juror 177's use of a dictionary definition concerning this contested element of the offense was inherently "more than [an] innocuous" incident. *See Basham*, 561 F.3d at 319. Accordingly, we apply the *Remmer* presumption here, and turn now to consider whether the government has rebutted the presumption of prejudice that has arisen in this case.

## C.

In determining whether the government has rebutted this presumption of prejudice, we agree with the district court's analysis that the *Mayhue* factors, employed in *McNeill*, provide the proper framework for our consideration of the parties' arguments.[22] These factors include:

> (1) The importance of the word or phrase being defined to the resolution of the case.

---

[21]We note that these concerns are greater here because the district court only became aware of the juror misconduct after the verdicts and, thus, did not have an opportunity to take remedial action, such as giving a curative instruction to the jury. Accordingly, our analysis in the present case does not purport to be applicable to other situations in which misconduct is discovered before a verdict is reached, and the district court appropriately acts to alleviate the potential for prejudice.

[22]The parties each cite *Mayhue* and rely on the *Mayhue* factors in support of their respective arguments.

(2) The extent to which the dictionary definition differs from the jury instructions or from the proper legal definition.

(3) The extent to which the jury discussed and emphasized the definition.

(4) The strength of the evidence and whether the jury had difficulty reaching a verdict prior to introduction of the dictionary definition.

(5) Any other factors that relate to a determination of prejudice.

*Mayhue*, 969 F.2d at 924.

In applying these factors, our consideration of the jurors' testimony is constrained by Rule 606(b) of the Federal Rules of Evidence. This Rule generally prohibits the consideration of post-verdict juror testimony concerning "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1).

The Rule provides a very limited exception, which allows a juror to testify regarding whether "extraneous prejudicial information was improperly brought to the jury's attention;" or whether "an outside influence was improperly brought to bear on any juror."[23] Fed. R. Evid. 606(b)(2). Thus, "although a juror can testify that she consulted an extraneous influence and related her findings to the panel, neither she nor any other juror can testify about any effect the extraneous influence may have had on the verdict or on the jury deliberations."

---

[23]The Rule provides a third exception for juror testimony concerning whether "a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2)(C).

*McNeill*, 476 F.3d at 226 (King, J., concurring in judgment) (citing Fed. R. Evid. 606(b), and *Mayhue*, 969 F.2d at 921).

i.

The first *Mayhue* factor, the importance of the word or term at issue to the resolution of the case, weighs heavily in Lawson's favor. Juror 177 used Wikipedia to research the term "sponsor," which is an element of the animal fighting offenses for which Lawson was on trial. *See* 7 U.S.C. § 2156 ("it shall be unlawful for any person to knowingly sponsor or exhibit an animal in an animal fighting venture"). Indeed, the district court agreed that the term "sponsor" was important to the case for this reason.

The government's argument with respect to this factor is especially weak. The government concedes that the term "sponsor" "may be crucial to 7 U.S.C. § 2156," but argues that the term was not crucial to the verdict in this case. In essence, despite the absence of a special verdict form with respect to this issue, the government argues that the jury necessarily convicted Lawson under an "aiding and abetting" theory of liability rather than under a theory of principal liability. In advancing this argument, the government relies on the testimony of Juror 185, who stated that any words researched by Juror 177 became "null and void" because the jury "ended up . . . using a different section of the jury instruction . . . for the section that we were deliberating on. . . . [We] didn't need that word."

We must reject the government's argument, because a contrary conclusion would undermine the very purpose of Rule 606(b). As we have explained, Rule 606(b) prohibits testimony concerning jurors' thought processes during deliberations. The government's reliance on Juror 185's testimony, which discusses the basis on which the jury rested its decision, goes far beyond the bounds of the limited exceptions provided in Rule 606(b). *See Cheek*, 94 F.3d at 143 ("Rule

606(b) prohibits all inquiry into a juror's mental process in connection with the verdict."). Accordingly, we resolve the first *Mayhue* factor in Lawson's favor.

ii.

The second *Mayhue* factor, "the extent to which the dictionary definition differs from the jury instructions or from the proper legal definition," presents a unique question in these circumstances.[24] The district court hearing took place nineteen days after Juror 177 conducted his internet research, and Juror 177 no longer retained the printout of his original research. As the district court recognized, "definitions on Wikipedia are subject to change by users, and the definition at issue (of 'sponsor') had, according to Court's Ex. 1, been changed between the time Juror 177 consulted this external source and when he repeated the same steps to produce Court's Ex. 1."[25] Accordingly, the district court properly "assume[d] that the definition of 'sponsor' shown in Court's Ex. 1 is different in at least some respects from what Juror 177 obtained and consulted during deliberations."

Despite these observations, the district court concluded that "the meaning Juror 177 appears to have taken from the lengthy definition and related discussion" in the Wikipedia entry for "sponsor" was "consistent with the definition that the court would have provided had it been asked for a definition." The district court further concluded that "any meaning germane to this action which may be drawn from the definition has remained unchanged." Upon our review of the record, and taking into account the fact that the government bears the bur-

---

[24]We note that the district court did not provide a jury instruction concerning the definition of "sponsor."

[25]The "date stamp" on the Wikipedia printout provided by Juror 177 indicates that he researched and printed the document on May 20, 2010, 14 days after he first researched the term, and five days before the district court's hearing.

den of rebutting the presumption under *Remmer*, we conclude that the district court's analysis of this second *Mayhue* factor is highly speculative.

We are greatly concerned about the use of Wikipedia in this context. As an initial matter, we observe with near certainty that the Wikipedia entry that Juror 177 researched contained significantly more information than any traditional legal definition of the term "sponsor." The Wikipedia entry for that term reviewed by the district court is three pages long, and contains a thirteen-paragraph "definition" that reads more like a narrative than a definition. This Wikipedia entry also contained a three-paragraph section titled "sponsorship controversies," as well as internal and external "weblinks." Thus, even if some part of the Wikipedia entry is not in direct substantive conflict with traditional legal definitions of the term "sponsor," the expansive nature of that Wikipedia entry suggests that "[t]he extent to which the [Wikipedia] definition differs from the proper legal definition" likely is significant. *See Mayhue*, 969 F.2d at 924.

Most importantly, however, we have no indication in the record regarding the actual content of the Wikipedia entry for the term "sponsor" that Juror 177 obtained. The government has not argued, nor has it provided evidence establishing, that the Wikipedia entry for the term "sponsor" can be retraced to its form when Juror 177 first researched the term. Moreover, even assuming that previous Wikipedia entries can be retrieved,[26] we would be unable to consider this fact on appeal in the absence of a firm basis in the record for concluding that the Wikipedia archives themselves are accurate and trustworthy. Thus, it is apparent that Juror 177's use of Wikipedia, under the circumstances of this case, makes meaningful anal-

---

[26]We observe that Wikipedia claims that its software "retains a history of all edits and changes." *See* http://en.wikipedia.org/wiki/Wikipedia:About#Strengths.2C_weaknesses.2C_and_article_quality_in_Wikipedia (accessed on April 16, 2012).

ysis of the second *Mayhue* factor impossible. Accordingly, because the *Remmer* rebuttable presumption places the evidentiary burden on the government, we must conclude that this factor weighs in favor of Lawson.

### iii.

The third *Mayhue* factor requires us to consider "[t]he extent to which the jury discussed and emphasized the definition." *See Mayhue*, 969 F.2d at 924. We agree with the district court's conclusion that the jurors with whom Juror 177 may have shared his research, or who were aware that Juror 177 conducted such research, placed little emphasis on the Wikipedia definition obtained by Juror 177.

That conclusion, however, does not end our inquiry. We have held previously that "if even a single juror's impartiality is overcome by an improper extraneous influence, the accused has been deprived of the right to an impartial jury." *Fullwood v. Lee*, 290 F.3d 663, 678 (4th Cir. 2002) (citing *Parker v. Gladden*, 385 U.S. 363, 366 (1966) (per curiam)). Thus, the impact that the extrinsic information had on the juror who obtained the information is important in and of itself. The district court noted from Juror 177's testimony that he gave little emphasis to the definition in deciding the case. However, the district court did not consider this aspect of Juror 177's testimony in the context of the government's evidentiary burden on this issue.

When considered in that context, we observe that several other material aspects of Juror 177's testimony were contradicted by the testimony of the other members of the jury. Therefore, in view of the government's burden, we conclude with regard to the third *Mayhue* factor that the extent to which Juror 177 was influenced by Wikipedia remains uncertain.

### iv.

We next examine the fourth *Mayhue* factor, namely "[t]he strength of the evidence and whether the jury had difficulty

reaching a verdict prior to introduction of the dictionary definition." With regard to the strength of the evidence, the district court held that "the evidence against each of the Defendants in the consolidated trial was strong." However, we note that the district court appeared to rely on the possibility that the jurors convicted Lawson on the alternative theory of aiding and abetting. For instance, the district court noted that "[a]s to the definition[ ] of 'sponsor' . . . , it is significant that each of the Defendants could be convicted not only for his or her own activities, but (depending on the charge) for conspiring with or aiding and abetting others in exhibiting or sponsoring an animal in an animal fighting venue."

As we already have observed, the issue whether the jury convicted Lawson under an aiding and abetting theory cannot be resolved in this case without inviting improper speculation and violating the general prohibition of Rule 606(b). Additionally, because we are not examining the sufficiency of the evidence under a deferential standard applicable to such inquiries, we are unable to consider that the jury may have relied on one theory of liability over another. *Cf. United States v. Burgos*, 94 F.3d 849, 863 (4th Cir. 1996) (en banc) (in reviewing challenges to the sufficiency of the evidence supporting a conviction, our task is to determine, "viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government, whether the evidence adduced at trial could support *any* rational determination of guilty beyond a reasonable doubt.") (internal quotation marks omitted) (emphasis added). Instead, we must examine whether the evidence was strong with regard to the issue whether Lawson "sponsor[ed]" an animal in an animal fighting venture. On this narrow issue, the government does not provide meaningful argument.[27] Thus, we are unable to

---

[27]The government merely argues in a conclusory manner that "[t]he evidence against all defendants was strong. Each defendant was identified on video, and each defendant was described as either actively participating in the events, or aiding and abetting in their own way (as organizers, referees or gaff makers)." Gov't Br. at 51-52.

state for purposes of applying the *Remmer* presumption that the evidence against Lawson was strong.

We also consider under this *Mayhue* factor whether the jury had difficulty reaching a verdict prior to Juror 177's Wikipedia research. The jury began its deliberations on Thursday, May 6, 2010 at about 4:00 p.m. The jury was excused for the evening after 5:30 p.m. Juror 177 researched and printed the Wikipedia entry defining the term "sponsor" the next morning, shortly before the jury resumed deliberations at about 9:00 a.m. The jury reached its verdict at about 4:30 p.m. that afternoon. Based on this timeline, we cannot say that the jury had difficulty reaching a verdict prior to Juror 177's improper research. Accordingly, although we conclude that this inquiry is of limited import in this case, this aspect of the fourth *Mayhue* factor weighs in favor of the government. When balanced, however, with the "strength of the evidence" inquiry discussed above, the fourth *Mayhue* factor either is in equipoise or weighs in favor of Lawson.

v.

Finally, we consider the fifth *Mayhue* factor, a "catch all" factor that allows us to consider "[a]ny other factors that relate to a determination of prejudice." We observe here another aspect of Wikipedia, namely, its reliability. According to the "Wikipedia:About" entry, at least in its form as of April 16, 2012, Wikipedia describes itself as "a multilingual, web-based, free-content encyclopedia project based on an openly editable model." http://en.wikipedia.org/wiki/Wikipedia :About (the "About Wikipedia" entry). Indeed, the "About Wikipedia" entry notes that:

> Wikipedia is written collaboratively by largely anonymous Internet volunteers who write without pay. Anyone with Internet access can write and make changes to Wikipedia articles (except in certain cases where editing is restricted to prevent disruption

> or vandalism). Users can contribute anonymously, under a pseudonym, or with their real identity, if they choose.

*Id.* The "About Wikipedia" entry further notes that "[a]nyone with Web access can edit Wikipedia . . . . About 91,000 editors—from expert scholars to casual readers—regularly edit Wikipedia." *Id.*

Given the open-access nature of Wikipedia, the danger in relying on a Wikipedia entry is obvious and real. As the "About Wikipedia" material aptly observes, "[a]llowing anyone to edit Wikipedia means that it is more easily vandalized or susceptible to unchecked information." *Id.* Further, Wikipedia aptly recognizes that it "is written largely by amateurs." *Id.*

We observe that we are not the first federal court to be troubled by Wikipedia's lack of reliability.[28] *See Bing Shun Li v. Holder*, 400 F. App'x 854, 857-58 (5th Cir. 2010) (expressing "disapproval of the [immigration judge's] reliance on Wikipedia and [warning] against any improper reliance on it or similarly unreliable internet sources in the future"); *Badasa v. Mukasey*, 540 F.3d 909, 910–11 (8th Cir. 2008) (criticizing immigration judge's use of Wikipedia and observing that an entry "could be in the middle of a large edit or it could have been recently vandalized"); *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 977 (C.D. Cal. 2010) (criticizing parties' reliance on Wikipedia); *Kole v. Astrue*, No. CV 08-0411, 2010 WL 1338092, at *7 n.3 (D. Idaho Mar. 31, 2010) (admonishing counsel from using Wikipedia as an authority,

---

[28]We note, however, that this Court has cited Wikipedia as a resource in three cases. *See Brown v. Nucor Corp.*, 576 F.3d 149, 156 n.9 (4th Cir. 2009) (citing Wikipedia entry as a second authority for the term "standard deviation"); *United States v. Smith*, 275 F. App'x 184, 185 n.1 (4th Cir. 2008) (unpublished) (quoting Wikipedia definition of a "peer-to-peer" computer network); *Ordinola v. Hackman*, 478 F.3d 588, 594 n.4 (4th Cir. 2007) (citing Wikipedia entry for definition of "calcium oxide").

observing that "Wikipedia is not a reliable source at this level of discourse"); *Baldanzi v. WFC Holdings Corp.*, No. 07–CV–9551, 2010 WL 125999, at *3 n.1 (S.D.N.Y. Jan. 13, 2010) (observing that Wikipedia "touts its own unreliability"); *Campbell ex rel. Campbell v. Secretary of Health and Human Servs.*, 69 Fed. Cl. 775, 781 (Fed. Cl. 2006) (observing dangers inherent in relying on Wikipedia entry).

vi.

In balancing the *Mayhue* factors discussed above, we conclude as a matter of law that the government has failed to rebut the *Remmer* presumption of prejudice. The first factor, the importance of the term at issue, weighs strongly in favor of Lawson. The second, third, and fourth factors either present close questions or weigh in Lawson's favor due to the evidentiary and analytical uncertainties present in this case. The fifth factor weighs in Lawson's favor.

These conclusions reflect the fact that there remain many unresolved questions in this case due to the unreliability and ever-changing nature of Wikipedia, to Juror 177's failure to retain a copy of the printout containing the entry he examined, to the government's failure to establish whether the entry could be "retraced," to the differences between Juror 177's recollection of the events at issue and the recollections of his fellow jurors, and to the constraints imposed by Fed. R. Evid. 606(b). We do not know what the Wikipedia entry actually said, how it may have differed from a traditional legal definition of the term "sponsor," whether Juror 177 used the entry in arriving at his decision, and under what theory of liability the jury convicted the defendants. In short, there are many uncertainties here, and, under *Remmer*, "it is the prosecution" that "bears the risk of uncertainty." *United States v. Vasquez-Ruiz*, 502 F.3d 700, 705 (7th Cir. 2007). Therefore, because the government has a "heavy obligation" to rebut the presumption of prejudice by showing that "there is no reasonable possibility that the verdict was affected by the" external influ-

ence, *Cheek*, 94 F.3d at 142, the government's showing in this case, as a matter of law, does not satisfy that obligation.

We do not set aside a jury's verdict lightly. However, the Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). We have held that "[n]o right touches more the heart of fairness in a trial." *Stockton*, 852 F.2d at 743. In this case, we are unable to say that Juror 177's use of Wikipedia did not violate the fundamental protections afforded by the Sixth Amendment. Accordingly, we vacate the appellants' convictions under the animal fighting statute, and we award them a new trial with respect to those charges.[29]

## VI.

We next consider the challenges made by several of Scott Lawson's co-defendants, including Dyal, Sheri Hutto, Wayne Hutto, and Collins (collectively, Dyal), to their convictions for conspiracy to engage in an illegal gambling business, in violation of 18 U.S.C. § 371, and for operating an illegal gambling business, in violation of 18 U.S.C. § 1955 (collectively, the gambling convictions).[30] The language of 18 U.S.C.

---

[29]We address the conspiracy convictions relating to the animal fighting statute later in this opinion. Additionally, in light of our conclusion regarding the juror's misconduct, we need not address Lawson's other statutory and evidentiary challenges to his convictions relating to the Animal Welfare Act. These additional issues that we do not address include: (1) whether the district court erred in denying the defendants' motion for judgment of acquittal based on the sufficiency of the evidence pertaining to the animal fighting venture's connection to interstate commerce; (2) whether the district court erred in denying the defendants' request to instruct the jury that the government had the burden to prove that the defendants' activities had a *substantial* effect on interstate commerce for a conviction to obtain; and (3) whether the district court erred in admitting certain evidence relating to Lawson's sale of gaffs.

[30]Lawson and Peeler were not charged with participating in any gambling activities relating to the animal fighting venture.

§ 1955 provides, in relevant part, that "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both." The statute defines an "illegal gambling business" in relevant part as a "gambling business which is a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1)(i).

Dyal raises two arguments in seeking to overturn the gambling convictions. First, Dyal contends that the district court erred in failing to charge the jury that Dyal must have known that her conduct constituted gambling under South Carolina law. Second, Dyal argues that the district court erred in instructing the jury that the South Carolina gambling statute, S.C. Code § 16-19-130, is violated when a person pays an entry fee to enter a contest of skill and the winnings depend on the number of entries. Both these arguments address issues of law, and, accordingly, we review these issues de novo. *Cheek*, 94 F.3d at 140.

## A.

Dyal argues that the district court erred by failing to instruct the jury that the defendants must know that their conduct constituted illegal gambling under South Carolina law.[31] According to Dyal, the district court's construction of the statute improperly eliminated any mens rea requirement, and allowed the government to obtain a conviction simply by showing that the defendants conducted an enterprise that accepted entry fees for a derby, and that the amount of winnings was dependent on the number of entries. Dyal contends that if she concluded in "good faith" that her conduct was not gambling, then she could not be convicted under 18 U.S.C.

---

[31]Dyal originally contended that the district court improperly struck from the indictment the words "willfully" and "knowingly," but has abandoned that facet of her argument.

§ 1955, even though that statute may set forth only a general intent crime. We disagree with Dyal's argument.

Initially, we observe that the plain language of 18 U.S.C. § 1955 does not require that a defendant know that her conduct constitutes illegal gambling under state law. Accordingly, numerous courts have rejected the precise argument that Dyal makes here. *See United States v. Ables*, 167 F.3d 1021, 1031 (6th Cir. 1999) (in conviction under § 1955 for operating a "bingo" game, upholding district court's refusal to grant jury instruction that defendant could not be convicted if he had good-faith belief he was not acting in violation of state law); *United States v. Cyprian*, 23 F.3d 1189, 1199 (7th Cir. 1994) (in case also involving conviction under § 1955 for operating a bingo game, holding that because guilt under § 1955 is based on "conduct," defendant did not need to know that his actions were illegal, but only that he performed the acts in question); *United States v. Hawes*, 529 F.2d 472, 481 (5th Cir. 1976) (rejecting argument that government must show accused had knowledge his conduct violated state law in order to obtain conviction under § 1955, and noting that "[i]t is sufficient that appellants intended to do all of the acts prohibited by the statute and proceeded to do them"); *United States v. Thaggard*, 477 F.2d 626, 632 (5th Cir. 1973) (same); *see also United States v. Cross*, 113 F. Supp. 2d 1253, 1256 (S.D. Ind. 2000) (holding that inclusion of term "knowingly" in indictment "over alleges the mens rea of the Section 1955 offense," a general intent crime, and that the inclusion of the term was surplusage and "should and will be disregarded").[32]

---

[32]Although Dyal cites *United States v. O'Brien*, 131 F.3d 1428, 1430 (10th Cir. 1997) for the proposition that the government must show that a defendant knew that her act was one of participation in gambling, the court specifically stated in *O'Brien* that "Section 1955 is not a specific intent statute," and that "[t]o be convicted under this provision, . . . a defendant need not know that the gambling business . . . was violative of state law." *Id.* Thus, Dyal's reliance on *O'Brien* weakens her argument rather than strengthens it.

We conclude that the reasoning employed in these cases is persuasive, and we hold that Section 1955 is a general intent crime, which does not require the government to establish that the defendants knew that their conduct violated state law. We also agree with the Sixth Circuit's decision in *Ables* that a good-faith instruction, such as the one that Dyal essentially requested in this case, is unavailable under these circumstances. Accordingly, we reject Dyal's argument that the district court erred in failing to instruct the jury that the defendants must know their conduct constituted illegal gambling under South Carolina law.

### B.

Alternatively, Dyal argues that the district court erred in instructing the jury on the elements of S.C. Code § 16-19-130.[33] That section of the South Carolina Code provides that it is illegal for any person to:

> record[ ] or register[ ] bets or wagers . . . upon the result of any:
>
> > (a) trial or contest of skill, speed or power of endurance of man or beast;
> >
> > . . . or
> >
> > (c) lot, chance, casualty, unknown or contingent event whatsoever.
>
> [Or] aid[ ], assist[ ] or abet[ ] in any manner any of the aforesaid acts.

S.C. Code § 16-19-130(3), (6). The district court instructed the jury, in relevant part, as follows:

---

[33]As discussed, a conviction under 18 U.S.C. § 1955 requires as an element of the offense that the defendant have violated a state or local gambling law.

Section 16-19-130 of the South Carolina Code makes it illegal to record or register bets or wagers, with or without writing, upon the result of any trial or contest of skill, speed or power of endurance of man or beast, or aid, assist or abet in any manner in the aforesaid acts.

For purposes of South Carolina law, a monetary amount awarded to the winner of a contest is not a bet or wager if it is a set amount funded by the sponsor of the event and not dependent on the number of entrants or amounts those entrants have paid to participate in the event. Conversely, payment of a monetary prize is considered a bet or wager if the amount to be awarded is dependent on and funded by fees paid by other contestants or entrants in the event.

Dyal argues that the district court misconstrued the statute. She contends that it is a "distinction without a difference" to determine whether an activity constitutes gambling based on the source of the prize money, and whether that prize money is dependent on the number of entrants and the fee that they have paid. We disagree with Dyal's argument.

We could not locate, nor did the parties direct us to, any South Carolina cases elaborating on the definitions of "bet" or "wager," as those terms are used in S.C. Code § 16-19-130. However, the government relies on a 2003 opinion letter issued by the Office of the South Carolina Attorney General. In that letter, the Attorney General stated that "mere participation in [a] game of skill where a contestant is required to pay an entrance fee, *such fee does not specifically make up the purse or premium contested for*, and the sponsor of such event is not a participant for a prize, does not constitute a violation of statutes similar to § 16-19-130." Letter from Robert D. Cook, Ass't Dep. Att'y Gen., to The Honorable Glenn F. McConnell, President Pro Tempore, South Carolina Senate (Aug. 29, 2003), *available at* 2003 WL 22050876, at *2

(emphasis added). The letter opinion later states that when "participants pay an entry fee" to enter an event, "but the entry fee does *not* determine or make up the prize, purse or premium," the event would likely be held by a court not to violate S.C. Code § 16-19-130. *Id.* at \*4 (emphasis added).

In the absence of any South Carolina law to the contrary, we find persuasive the South Carolina Attorney General's interpretation of this South Carolina law. Indeed, that interpretation is supported by the view of the highest court of Nevada, a state with a particular interest in, and familiarity with, gambling. The Supreme Court of Nevada has held that an event involves a wager if the prize or premium is not a fixed amount but rather, as is the case here, depends upon the number of entrants. *Las Vegas Hacienda, Inc. v. Gibson*, 359 P.2d 85, 86 (Nev. 1961) ("A prize or premium differs from a wager in that in the former, the person offering the same has no chance of gaining back the thing offered, but, if he abides by his offer, he must lose; whereas in the latter, each party interested therein has a chance of gain and takes a risk of loss."); *cf. id.* at 87 ("The fact that each contestant is required to pay an entrance where the entrance fee does not specifically make up the purse or premium contested for does not convert the contest into a wager."); *see also Nevada v. GNLV Corp.*, 834 P.2d 411, 412-13 (Nev. 1992) (citing *Las Vegas Hacienda* for proposition that "[a] prize differs from a wager in that the person offering the prize must permanently relinquish the prize upon performance of a specified act[, but] [i]n a wager, each party has a chance of gain and takes a risk of loss") (internal quotation marks removed). Accordingly, based on these distinctions, we conclude that the district court did not err its instructions to the jury concerning the elements of S.C. Code § 16-19-130. For these reasons, we affirm Dyal's convictions for violating the illegal gambling statute, 18 U.S.C. § 1955.

## VII.

In view of our holdings vacating the convictions for violating the animal fighting statute but affirming the illegal gam-

bling statute convictions, we find it necessary to determine whether the conspiracy convictions may stand. We first consider the conspiracy convictions relating to Scott Lawson and Peeler, who were not indicted or convicted for engaging in illegal gambling under 18 U.S.C. § 1955.

Scott Lawson and Peeler were charged with "Conspiracy to Violate the Animal Welfare Act." As alleged in the Lawson indictment, the only object of the conspiracy in which they allegedly participated was to "sponsor and exhibit an animal in an animal fighting venture," in violation of 7 U.S.C. § 2156(a)(1). Thus, the term "sponsor" was integral to the conspiracy conviction, and for the reasons discussed above, we are unable to conclude that "there is no reasonable possibility that the verdict was affected by" Juror 177's misconduct in researching the definition of "sponsor" on Wikipedia. *See Cheek*, 94 F.3d at 142. Accordingly, we vacate Scott Lawson's and Peeler's conspiracy convictions, and award them a new trial with respect to that charge.

The conspiracy charges and convictions for defendants Dyal, Sheri Hutto, Wayne Hutto, and Collins (the Dyal defendants) require us to engage in a different analysis. With respect to these defendants, the government framed its indictments as alleging a single conspiracy count for "Conspiracy to Violate the Animal Welfare Act *and* to Engage in an Illegal Gambling Business." (Emphasis added.) The indictment thus alleges a multi-object conspiracy, and does so in the conjunctive.

Ordinarily, when a conviction under a multi-object conspiracy indictment is supported on one ground but is legally inadequate on the other, the conviction will be reversed in accordance with the Supreme Court's decision in *Yates v. United States*, 354 U.S. 298, 304-12 (1957). As we have explained, under *Yates*, "reversal is required when a case is submitted to a jury on two or more alternate theories, one of which is legally (as opposed to factually) inadequate, the jury

returns a general verdict, and it is impossible to discern the basis on which the jury actually rested its verdict."**[34]** *United States v. Moye*, 454 F.3d 390, 400 n.10 (4th Cir. 2006) (en banc) (citing *Yates*, 354 U.S. at 311-12.).

Here, however, in contrast to the general verdict rendered in *Yates*, the verdict in the present case reveals that the jury had two separate bases for convicting the Dyal defendants of the conspiracy charges. Although the indictment alleged both objects in a single count, the jury's verdict forms with respect to each of the Dyal defendants listed separate guilty verdicts for "Count 1 – Conspiracy (Animal Welfare Act: June 18, 2008 through April 18, 2009)" and "Count 1 – Conspiracy (illegal gambling business: May 2007 through April 18, 2009)." Thus, we are not confronted with a situation in which we are uncertain whether a jury's verdict was solely attributable to an underlying conviction which we have set aside on legal grounds. *Cf. Yates*, 354 U.S. at 311-12. Accordingly, the conspiracy convictions for the Dyal defendants are supported by a valid and independent legal basis that is apparent from the record, and we therefore affirm those convictions.**[35]**

---

**[34]**A different rule is applicable when the conviction concerning one of the objects is set aside on factual, as opposed to legal, grounds. *See Griffin v. United States*, 502 U.S. 46, 56 (1991) (holding that the Due Process Clause does not require a general guilty verdict on a multi-prong conspiracy be set aside if the *evidence is inadequate* to support conviction as to one of the objects); *Turner v. United States*, 396 U.S. 398, 420 (1970) ("when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as Turner's indictment did, the verdict stands if the *evidence is sufficient* with respect to any one of the acts charged") (emphasis added).

**[35]**We observe that Collins individually challenges his sentence imposed by the district court, arguing that the district court erred by: (1) adding four levels to his guidelines-recommend sentence, U.S.S.G. § 3B1.1, upon concluding that he was an organizer or leader in the cockfighting venture and the illegal gambling business; and (2) declining to adjust Collins' sentence on the basis that he demonstrated acceptance of responsibility, U.S.S.G. § 3E1.1. In light of our conclusion that Collins' convictions for violating the animal fighting statute cannot stand and that Collins is entitled to a new trial with respect to those charges, we need not reach Collins' arguments concerning the sentence imposed by the district court.

## VIII.

In conclusion, we hold that the animal fighting statute is a constitutional exercise of Congress' power under the Commerce Clause, and that the district court did not err in holding joint trials of Scott Lawson and his co-defendants. However, we hold that the government has failed to demonstrate that a juror's misconduct did not affect the verdict with respect to the violations of the animal fighting statute. Accordingly, we vacate all the defendants' convictions for violating the animal fighting statute.

We reject the challenges made by several of the defendants to their convictions for participating in an illegal gambling business, and we affirm the illegal gambling statute convictions of the Dyal defendants. We affirm the conspiracy convictions of the defendants who were charged with engaging in a conspiracy to violate both the Animal Welfare Act and to violate the illegal gambling business statute, but we vacate the conspiracy convictions of Scott Lawson and Peeler, whose conspiracy charges related solely to the Animal Welfare Act. We do not reach the merits of Collins' arguments concerning his sentencing, nor do we address the remaining issues raised by the appellants. We remand this matter to the district court for further proceedings consistent with this opinion.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*